BLACKSTONE VALLEY GAS & ELECTRIC COMPANY *vs.*
RHODE ISLAND POWER TRANSMISSION COMPANY.

MARCH 9, 1940.

REARGUMENT DENIED APRIL 27, 1940.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker & Condon, JJ.

.Flynn, C. J.   This is a bill in equity to set aside an arbitrator's award, and for other incidental and general relief. It was heard on bill, answer, replication and proof before a justice of the superior court who decided, on the evidence introduced before him, that the bill of complaint be denied and dismissed because of one particular reason.   A decree was entered accordingly and the cause is before us on the complainant's appeal from that decree.

The principal facts material to the instant cause may be grouped within three main divisions, *viz.*:   (1)   The pre-arbitration period;   (2)   the arbitration proceeding;   (3)   the superior court proceeding.

The pre-arbitration period began with the contract between the complainant, hereinafter generally referred to as the "lighting company", and the respondent, hereinafter

referred to as the "power company". This contract was entered into under date of May 26, 1914. It provided, among other things, that the power company should sell and furnish, and the lighting company should purchase and receive certain electricity for the period from July 1, 1914, and other electricity from January 1, 1915, until the contract should be terminated on a fixed date after July 1, 1950 by either party giving to the other at least one year's written notice specifying the date of termination.

That contract also provided for an arbitration in accordance with the first paragraph of Article XVI, which reads: "The prices for electricity (including service charges for primary electricity), except resale secondary electricity, may, at the request of either party made in writing six (6) months before July 1, 1925, July 1, 1935, and July 1, 1945, be readjusted on said dates, and if the parties fail to agree upon a readjustment three (3) months prior to a readjustment date, then said prices shall be readjusted by arbitration in the manner provided in Article XXI."

The other paragraph of Article XVI, which is controlling in this cause, reads: "Any readjustment in price shall be based solely upon an increase or decrease in the cost of fuel or changes in the art and methods of generating electricity which would result in an increase or decrease of efficiencies or cost."

The provisions of these two paragraphs gave rise at the very outset to at least three preliminary and vital questions, before the readjusted prices of electricity could be properly determined in accordance with the contract. These questions were: First, what interpretation would the arbitrator place upon the contract, particularly Article XVI? Such an interpretation of Article XVI by the arbitrator was admitted by the parties and the arbitrator to be a primary question, which materially affected the cost and read-

justed prices of electricity to be fixed by arbitration in accordance with the contract. Second, what method or theory, as the parties refer to it, that is, what standard, would the arbitrator use under his interpretation of the contract in order to determine the readjusted prices for electricity, according to the "changes in the art and methods of generating electricity which would result in an increase or decrease of efficiencies or cost"? Third, what procedure should be agreed upon and followed by the parties in the arbitration proceeding in furnishing evidence to assist the arbitrator in determining the cost, efficiencies and readjusted prices under his interpretation of Article XVI?

Confronted with these preliminary and vital questions, which arose from the terms of Article XVI, the attorney for the lighting company, hereinafter called Reilly, and the attorney for the power company, hereinafter called Hall, held a meeting with the selected arbitrator, Henry G. Wells, Esq., on October 25, 1935. This conference was designed to obtain: (1) An understanding between the parties and the arbitrator concerning a proper interpretation of the contract; (2) the making of some procedural agreement to govern the submission of evidence in the arbitration proceeding; and (3) the deciding of other incidental matters.

At this conference Reilly, Hall and the arbitrator all apparently recognized the necessity of interpreting Article XVI of the contract, and particularly the second paragraph thereof. It was then stated and was not denied that this paragraph "was a hard nut to crack." Moreover, the arbitrator, after reading this paragraph, told Reilly and Hall that "it was quite evident that there were a lot of different ways of showing how changes in the art and methods of generating electricity would affect increases or decreases in costs." Reilly urged this very difficulty to the arbitrator as a reason for requesting him to make his own interpretation of the contract at the outset, thus making it possible to re-

strict the evidence to the costs, efficiencies and prices under whatever interpretation and "theory" the arbitrator would make and decide to use.

Because the arbitrator did not feel that he could or would interpret Article XVI at that time, and because the lighting company had to open the arbitration proceeding, Reilly took the precaution to seek some understanding or agreement as to the procedure which would govern the submission of evidence in the arbitration proceeding. Some understanding in that regard was apparently reached by the parties and the arbitrator at this conference. But the complete effect of that understanding upon the minds of Hall and the arbitrator was subsequently disputed by them, not however in the arbitration proceeding itself, but at the later hearing of this cause in the superior court, as will appear in dealing with the pleadings and hearing there.

Immediately after this conference of October 25, 1935, Hall made a written memorandum of his recollection of the agreement reached at that time, and he mailed to Reilly a copy thereof, expressing the hope that Reilly would find it accurate. Reilly also made a written memorandum of his own understanding of this substantial agreement. He did not mail a copy thereof to Hall, nor did he reply to Hall's letter.

The second division of important facts begins on December 2, 1935, when the arbitration proceeding opened. The lighting company, pursuant to Reilly's understanding of the procedural agreement reached on October 25, opened its case through its other attorney, Thomas Hunt, Esq. He referred to the agreement for submission, as apparently reached on October 25, and to the necessity for an interpretation of the contract before the arbitrator could determine, upon evidence to be submitted, the cost, efficiencies and readjusted prices in accordance with the second paragraph of Article XVI.

Reilly followed Hunt and elaborated upon Hunt's reference to the necessity for the arbitrator to interpret the contract; and he also expounded in greater detail what the lighting company contended was the only proper interpretation of Article XVI, particularly in view of the construction placed thereon by the letter of July 9, 1920, written by Malcolm G. Chace, president of the power company, who had signed the original contract. The pertinent part of this letter, which was written during earlier negotiations, concerning this Article, reads in part:

> "The theory of the contract which we originally made with you was that we would sell you power at a price slightly less than that at which you could make it. . . . What are your own costs in your present steam station and what would your costs be if you built a new station at the present time at the present construction costs and using the present price of fuel?"

Reilly further gave what he contended was the only proper theory or method of fixing costs, efficiencies and readjusted prices under the second paragraph of Article XVI. He then introduced evidence, apparently pursuant to the agreement of October 25th, which was confined solely to support his own theory and interpretation of the contract. At the end of what Reilly called the lighting company's *prima facie* case, he stated for the record on December 2, 1935, apparently after a conference with Hall, the substance of the procedural agreement made at the conference of October 25. The pertinent part of that statement reads:

> ". . . our desire naturally is that we shall ultimately have before you the strongest interpretation and all that can be said in regard thereto, of this contract; and secondly, all the evidence bearing upon our interpretation, as long as it holds before your Honor, and such evidence as we may see fit to produce upon an interpretation of the contract, *if it varies* from *either* that of ourselves *or* Mr. Hall." (italics ours)

No objection to that understanding or statement was made by Hall at that time. Nor did the arbitrator indicate any objection, or difference in his own understanding of the procedural agreement.

On December 30, 1935, just before the conclusion of all the evidence submitted by the lighting company under its own theory, Reilly made a further statement, as a memorial of their understanding, and as part of the submission. Because of its importance, it is quoted in full:

"Mr. Reilly: Now, your Honor, it has not appeared in the record what the understanding was between your Honor and Mr. Hall and myself in respect to the manner in which this case was to be presented, and therefore I am taking the liberty of stating it in substance here. My understanding was that we agreed that the Lighting Company should go forward and should interpret this contract in the manner in which they thought was the correct one, and on that interpretation would introduce its evidence; that if it should *subsequently* develop that the interpretation placed on the contract by the Lighting Company was different from that which your Honor placed on it, that then the Lighting Company was to have the opportunity to introduce evidence to meet your Honor's interpretation, and, in fact, that both the Lighting Company and the Power Company might at any time, and to such length as they saw fit, introduce evidence which they thought would be helpful to your Honor. *Do you understand that was our agreement?*

The Arbitrator. *That is as I understood it at the time of the conversation.*

Mr. Reilly. *Having that in mind,* we having placed the interpretation which we think is the correct one on the contract, and introduced evidence in accordance with it, the Lighting Company *now* rests its case, *subject to the provisos which I have stated.*

The Arbitrator. You do not expect the Arbitrator to make any decision at this time as to what his interpretation is?

Mr. Reilly. I am not expecting that at all; I merely wish to be certain that it is understood between us that at any time we may continue to go forward on any subject or in any way we think would be helpful to your Honor in deciding this case.

The Arbitrator. Not only that, but perhaps this is as good a time as any to make this observation: When the case is completed, it might be, in going over the evidence, there may be certain phases of the evidence which might be difficult of interpretation on my part, and it might be advisable for me to call the parties together again for further enlightenment. I assume that will be agreeable to both parties.

Mr. Hall. *The agreement was just as Mr. Reilly stated.* We told your Honor that what both parties wanted to do was to put our cards on the table before you, in order that you may arrive ultimately at a determination of what is a fair price for the primary and secondary power under this contract, *and the procedure is as Mr. Reilly has outlined.* . . . I am not going to burden your Honor with any opening. All I need to say about that is that our position is that of a general denial, both as to the interpretation of the contract and as to the evidence introduced. If that meets with your Honor's approval I should like to go ahead in that way." (italics ours)

The part of the record omitted, as above indicated, has to do solely with the procuring of respondent's witnesses, time to prepare cross-examination and the time of the next meeting for the convenience of the parties. Hall later proceeded in the way indicated by Reilly's statement and introduced his evidence.

The arbitration proceeding was formal and a stenographic record was made of such hearing. Copies thereof were furnished to the parties and the arbitrator before the next hearing and, as the hearings were held intermittently, all had ample opportunity to examine the record and to make any

desired corrections. The record of the proceeding on December 30, 1935 was examined and certain corrections therein were actually made by the arbitrator, but no change of any kind was made by the arbitrator or Hall concerning Reilly's statement, on that day, of the above-quoted procedural agreement; or of their own expressed assent to such statement as it then appeared in the record.

Throughout the arbitration proceeding, Reilly contended that the *only* proper interpretation of the second paragraph of Article XVI was to base the cost upon primary electricity, and that such electricity was to be generated in a supposed steam-electric plant erected and equipped within the area to be served by the lighting company and having the latest developments in the art and methods of generating electricity, ready to commence operating on July 1, 1935. This was generally referred to by the lighting company's attorneys as "the supposed plant theory". Reilly confined his affirmative evidence to prove or to defend this theory.

On the other hand, Hall denied the correctness of Reilly's interpretation of the contract and evidence; and contended that the proper and better evidence to be used by the arbitrator in finding the costs, efficiencies and readjusted prices, was under the interpretation and theories advanced by the power company as follows: (1) Evidence of actual costs of producing electricity in the existing Montaup plant, which was located and operating since 1925 at Somerset, Massachusetts, near Fall River, this being called "existing Montaup"; (2) evidence of experts as to what would be such costs at Montaup, if that were modernized and put on the best practical basis in accordance with "changes in the art and methods of generating electricity" between the date of the erection of that plant and July 1, 1935, this being called the "modernized Montaup theory"; (3) further evidence by expert witnesses as to what would be fair prices as of July 1, 1935 for electricity furnished in accordance with

the contract in question, this being called the "fair price theory".

At the conclusion of all the evidence which the parties cared to introduce up to that time, the arbitrator had not made his own interpretation of the contract; nor had he notified the parties of what interpretation or theory he would use to fix the cost and prices under the second paragraph of Article XVI. Thus far, the procedure had apparently followed Reilly's statement of the agreement as made in the record on December 2 and on December 30.

Hall then made a comprehensive closing argument. He contended that the arbitrator should reject the lighting company's interpretation of the contract and its supposed plant theory and its evidence in support thereof; and that he should determine the cost, efficiencies and readjusted prices for electricity under one of the three theories proposed by the power company and upon its evidence. In his closing argument Hall made no mention that he then had any understanding of the adopted procedural agreement which was different from that stated by Reilly in the record on December 30; nor did he then indicate that the agreement was not binding upon the parties and the arbitrator.

Reilly then made his final argument in which he stressed at great length the lighting company's interpretation of the contract as the *only* proper interpretation thereof. He contended that this was as dictated and confirmed by the construction placed on Article XVI in the previously-quoted letter of the power company's president, Malcolm G. Chace, who had signed the original contract; and he defended his supposed plant theory and the correctness of his evidence and costs against the direct and indirect attacks made upon them by the evidence and argument concerning the existing Montaup, Montaup modernized, and fair price theories, as advanced by the power company. Apparently believing that both parties and the arbitrator were bound by the

procedural agreement of December 30, Reilly made no further mention of it in his closing argument.

At the close of the arguments, the arbitrator took the case under consideration without indicating any change in his understanding of the procedural agreement as it appeared in the record on December 30. All the evidence and arguments were apparently submitted in accordance with that agreement as it was recorded.

On August 19, 1936, the arbitrator filed a final report and award in the arbitration proceeding without any previous notice to Reilly of any kind. For the first time he interpreted the contract, and made known what theory he used to fix the cost, efficiencies and prices. This proved to be different from Reilly's supposed plant theory. The arbitrator, recognizing the necessity of an interpretation of the contract as a primary and material question, decided that the 17,500 kilowatts of electricity, under and by the terms of the contract in question, were intended to be primary and not secondary.

The arbitrator observed that: "There being then no definite yardstick, and undoubtedly it would be difficult to devise one, much of the evidence is based on theories as well as facts and the relation of certain facts to certain theories. Hence it is obvious that the arbitrator must also *theorize* to a certain extent. . . . In view of the marked difference in the results as testified to by these men, (expert witnesses) and the absence of any hard and fast rule to assist in the determination, all that a non-specialist can do is to sift and balance the facts and theories and their mutual relationships and *then do his own theorizing*." (italics ours)

He then proceeded apparently to dismiss entirely the lighting company's contention and evidence, so far as costs, efficiencies and prices under Article XVI were concerned; and to consider, under his own theory, only the evidence presented by the four witnesses who testified for the power

company. Upon such evidence, which was actually introduced to support the existing Montaup, Montaup modernized and fair price theories, he found the cost, efficiencies and readjusted prices according to his own interpretation of the second paragraph of Article XVI, and under his own theory. The theory he used was different from the lighting company's supposed plant theory and was not the same as any one of the power company's theories. Rather it was substantially in the nature of a composite of the power company's three theories. Reilly received no previous notice concerning this decision and had no opportunity to present material evidence to meet the arbitrator's theory, in accordance with his view of the procedural agreement, which the arbitrator had assented to according to the arbitration record of December 30.

This final report and award was mailed to Reilly's office by the arbitrator on August 19, 1936, arriving there on August 21; but was not actually received by him until August 27, because he was on vacation; and the arbitrator sailed for South America on August 22 to attend to some important business, which actually kept him there for the better part of two years.

The third division of important facts begins with the bringing by the lighting company of the bill of complaint in the instant cause. The bill of complaint was brought to set aside the award, essentially because the lighting company had been deprived in the arbitration proceeding of a full and fair hearing in accordance with the contract and agreement for procedure, which was expressly and unqualifiedly assented to as a part of the submission by the parties and the arbitrator in the arbitration record.

Summarized, it set out the original contract and the provision thereunder which called for an arbitration, at stated periods, of the prices to be charged for electricity; and alleged a compliance by the lighting company with the terms

of the contract; the making of a preliminary agreement at the conference of October 25, 1935, with reference to the procedure to be followed in presenting evidence, particularly under the second paragraph of Article XVI, and reserving to the lighting company and power company the right at any time and at such length as they saw fit to introduce evidence bearing on the interpretation of the contract as finally determined by the arbitrator; the holding of the arbitration proceeding; the statement by Reilly of the substance of that agreement on December 2; the further statement by Reilly for the record, on December 30, 1935, of his understanding of the procedural agreement reached on October 25, and the express assent thereto by the arbitrator and Hall; the reliance by the lighting company, in presenting its case, upon the statements and agreements made on October 25, December 2 and December 30, 1935, and on January 27, 1936, during the arbitration proceeding; the final determination by the arbitrator upon the interpretation of the contract and the theory he used as a basis for costs and prices.

The bill further alleged that the award by the arbitrator was based upon a theory under the contract which was different from the lighting company's theory; that this was done without notice to it and in violation of the agreements and statements above set forth, thereby depriving the lighting company "of the opportunity of fully and completely presenting evidence to meet the interpretation placed upon the contract by the arbitrator"; that the lighting company did not fully present all of the evidence under the arbitrator's interpretation and theory because it relied upon the statements and agreements made by the parties and the arbitrator in the arbitration record; that the lighting company paid the prices fixed by the arbitrator *under protest,* pending a determination of the issues involved in the bill of complaint. The bill then prayed for suitable specific relief and for general relief as justice and equity may require.

Paragraph 9 of the bill of complaint specifically set out the procedural agreement which was stated by Reilly on December 30, and the assent thereto by Hall and the arbitrator according to the stenographic record of the arbitration proceeding for that date.

The power company's answer to paragraph 9 admitted the truth of the record as alleged, and added the last portion of the concluding paragraph that was not quoted in paragraph 9 of the bill, but which appears in our full quotation previously made in this opinion. The answer to that paragraph then went on to aver that the only question as to interpretation in the minds of the parties and the arbitrator on October 25, when the recorded agreement was made, concerned Article IV and not Article XVI of the contract; that, in any event, the statement made by Reilly, though correctly stated in the arbitration record, did not constitute an agreement; and that, if it did constitute an agreement, it was waived by the procedure followed and acquiesced in by the lighting company; and that the lighting company was estopped thereby from making its present claim.

At the hearing in the superior court, the power company was permitted, over objection, to introduce testimony of Hall and the arbitrator as to their lack of appreciation at the time, December 30, 1935, of the full meaning of the agreement which Reilly had just stated for the arbitration record.

The gist of Hall's testimony in that court is to the effect that Reilly's statement for the record on December 30, as quoted in paragraph 9 of the bill of complaint, "simply did not register", although he "had no doubt" that, on December 30, he had said "the agreement was just as Mr. Reilly stated." The arbitrator, also testifying in the superior court, stated that Reilly's statement of the agreement for the record "did not register *until the second sentence thereof.*" (italics ours) Neither Hall nor the arbitrator in their

testimony pointed to any portion of the record in the arbitration proceeding where either of them had raised any question as to the correctness or meaning of Reilly's statement.

Reilly also testified at the superior court hearing and explained his reasons for desiring to protect his rights by such an agreement as he stated for the record on December 2 and again on December 30. He also showed his reliance on that agreement throughout the arbitration proceeding. He further testified that, being conscious of having placed in the record the memorial of the statements and agreement and the unqualified assent of Hall and the arbitrator, he felt free to argue the strength of his case solely on his own interpretation; and to defend his theory against the other theories and evidence of the power company. He also testified to and identified two definite lines of affirmative evidence which he would have presented to meet the arbitrator's theory, if he had been given the opportunity, and which he claimed would have materially affected the figures that the arbitrator, under his own theory, eventually relied upon to base the costs and prices.

At the conclusion of the evidence and arguments, the trial justice filed a rescript in which he substantially restricted his finding and decision to one issue as appears from the last paragraph of his rescript. This paragraph summarizes his only express finding of fact and his actual decision, and reads: "We have seen the witnesses on the stand, we have examined the record before the arbitrator and the exhibits in the case, we have considered motives which might actuate witnesses, perhaps unconsciously to color their testimony, and we have weighed the circumstances surrounding all concerned at the time, together with the probabilities and we find that the complainant has failed to satisfy us by a fair preponderance of the testimony and evidence in the case that the agreement of October 25, 1935 *was entered into by the arbitrator* as alleged in the Bill of Complaint."

(italics ours). The other issues under the pleadings and evidence were not decided and there are no express findings of fact in the rescript except as quoted. A decree accordingly was entered from which the lighting company appealed.

The main grounds of appeal are, in substance, that the final decision in the rescript and the final decree based thereon were erroneous and against the law, and also against the evidence and the weight thereof; that the rescript contained certain material findings upon which the final decree was based and which were contrary to statements and admissions made in the respondent's answer; and that the trial justice erred in numerous rulings, set forth and described, as to the admissibility of certain evidence.

The transcript includes the entire arbitration record and comprises many volumes. The parties have filed voluminous briefs and reply briefs in support of their contentions; and they have argued exhaustively about every conceivable aspect or point in the case. Some of these points are answered by our conclusions on the facts as stated; and, in our opinion, certain others, though relevant, are not controlling. Stripped of all such impediments, the controlling issue is fairly narrow, namely, did the lighting company obtain a full and fair hearing *in the arbitration proceeding* in accordance with the contract and the procedure which the parties and the arbitrator adopted, according to the record, as part of the submission to the arbitrator? If it obtained such a hearing, the decree should be affirmed. If it was deprived by the arbitrator, intentionally or through misunderstanding, of such a full and fair hearing, the decree should be reversed, provided of course that no estoppel, waiver or laches is properly established.

We are of the opinion, upon a consideration of the pleadings and evidence, that the decree is erroneous and the award must be set aside for three principal reasons: First, the trial justice erred in finding that the lighting company

had not established a procedural agreement, as alleged in the bill, which was binding upon the arbitrator. Second, assuming that the decision of the trial justice is correct, so far as it goes, he nevertheless failed to make any decision upon the further and controlling issue in the case, under which the lighting company was entitled to a finding that there was no true arbitration, either because it was based upon a mutual misunderstanding or because the arbitrator made his award in violation of a mutual agreement of the parties as to the submission by which the arbitrator, having clear notice thereof, was bound. Third, regardless of whether the arbitrator agreed on October 25, 1935, as alleged, the lighting company at least was entitled, on this record, to rely upon the express representation of assent by the power company and the arbitrator to Reilly's statement of the agreement, made in the arbitration record of December 30; and the lighting company, having relied thereon to its material prejudice, was entitled to relief in equity and natural justice unless barred by estoppel, waiver, or laches.

It is generally established that courts will not ordinarily set aside an award in an arbitration proceeding that is properly held under common law. Every reasonable presumption is made in favor of such an award. The reason for that is because the parties presumably have had a full and fair hearing in accordance with their own agreement of submission. When such is the case, the parties get exactly what they agreed to. There would be little purpose or incentive in attempting settlement by arbitration, if courts would easily set aside such an award.

But courts of equity will interfere, in the interest of natural justice and at the instance of a proper aggrieved party, when an arbitrator refuses or fails to be bound by the contract and rules of submission, which became the law of the arbitration proceeding; or when, because of a mutual misunderstanding of a material agreement in the submission, there was not a true arbitration. The reasons for such

intervention by equity seem fundamental and plain. The arbitrator derives his jurisdiction from a mutual agreement of the parties to submit the matter to arbitration. The arbitrator's failure to conform with such agreement, or his violation thereof, however honest, goes to the root of the arbitrator's jurisdiction and prevents a true arbitration in the equitable sense.

The allegations of paragraph 9 of the bill of complaint are based verbatim upon statements in the record of the arbitration proceeding for December 30. The power company's answer thereto, and the evidence of the unimpeached arbitration record, presented in the first instance an issue to be determined by the court. This issue was whether the admitted record of what the parties and arbitrator said and did *in the arbitration proceeding* constituted an agreement that was binding on the arbitrator. Whether that was a correct statement of what had actually occurred on October 25 was important. But another and controlling issue was whether the power company and arbitrator, on December 30 *in the arbitration proceeding,* represented that they understood and agreed to that statement of Reilly for the purpose of governing the future arbitration proceeding and decision.

In our opinion the controlling evidence on these issues is undisputed. It comprises what was said and done by Reilly, Hall and the arbitrator *at the arbitration proceeding,* rather than what they testified to for the first time in the superior court. The bill alleges and the answer admits the fact that Reilly did make the statement for the record as alleged, and that Hall and the arbitrator unqualifiedly and specifically expressed their agreement thereto upon the record. The truth and accuracy of this evidence was unimpeached in the superior court. Indeed, it was referred to by the trial justice, and correctly so, as the best evidence. The words used by Reilly are plain and unambiguous,

particularly to experienced lawyers; and we do not think that they require any evidence to explain their meaning.

Upon such undisputed evidence, the first issue for the court to determine was whether those recorded statements constituted an agreement that was binding on the parties and the arbitrator. The trial justice, however, did not do this. He allowed Hall and the arbitrator to testify as to their understanding of the meaning of these statements without pointing out any particular word or phrase that was claimed to be ambiguous. This ruling amounted in substance to allowing them to construe the effect of that language as a whole; and to destroy, in effect, not only the best evidence of the agreement but their own recorded, express and unqualified assent thereto. In our opinion, testimony of this character invaded the province of the trial justice and, in determining whether the statement as made constituted an agreement, he should have disregarded such testimony.

But the power company insists that the language of the statement is ambiguous and that therefore testimony was necessary to explain it. We are not persuaded by this contention because it forces us to an unreasonable conclusion. It would make out Hall to be either incompetent or negligent. We decline to make any such assumption, which is demonstrated in the record and argument as so entirely contrary to fact. If Reilly's understanding of the agreement, as stated by him in the arbitration record on December 2, differed so vitally from the substance and effect of Hall's written memorandum of the October 25th conference, as the power company now contends, certainly that difference would have been fresh in Hall's mind on the opening day of the arbitration proceeding. Yet Hall made no objection whatever when Reilly stated, for the first time, in the record of that date the substance of that agreement. Moreover, if there was any substantial difference between the actual agreement on October 25 and Reilly's statement of it on

December 2, it is not probable that Hall would remain silent at that time. It is strange that the arbitrator also failed to call attention to any difference *at that time,* or to object to the accuracy of Reilly's statement.

Conceding that it possibly may be argued that its real meaning somehow escaped both Hall and the arbitrator, and "did not register" with them on the opening day of the arbitration proceeding, December 2, it cannot reasonably be again so argued with reference to Reilly's statement on December 30. At that time Reilly became more explicit and insistent upon getting the agreement of the arbitrator and Hall on the record, rather than trusting that such agreement would be inferred merely from their failure to object on December 2. Both Hall and the arbitrator then, on December 30, expressly and unqualifiedly agreed to Reilly's statement on the record and thus made it part of the submission which was binding upon the arbitrator in any event.

We think that the only reasonable conclusion from their express words and conduct is that neither Reilly nor Hall was negligent or incompetent; but that, on the contrary, the record shows that both were competent, careful and experienced trial counsel. They both knew what they wanted; what they were doing in such an important matter; and what was necessary for them to get into the record in order that each be protected. Hall, knowing that Reilly's statement of the agreement on December 30 protected *the power company,* as well as the lighting company, had no hesitancy in recording his unqualified assent.

Unless we take that view, we are asked to make the unreasonable deduction that Hall and the arbitrator were willing to state, in the arbitration record, their unqualified assent to a vital agreement whose meaning and effect they did not really understand. Experienced lawyers, such as Hall, Reilly and the arbitrator, do not expressly record their *unqualified* assent to any agreement until they are certain they understand its meaning.

Further, if the language were ambiguous and if evidence of the type in question here was admissible, as now contended, the burden was upon the power company to show wherein it was ambiguous; and also to prove to the trial justice that the correct interpretation of the agreement was that which Hall and the arbitrator disclosed for the first time in the superior court. The pleadings and evidence placed the burden of this issue upon the power company. Apparently the trial justice erroneously considered that such burden was on the lighting company. In thus shifting the burden on this issue, the trial justice was materially influenced in weighing the evidence, and in finding that the lighting company had not established that the arbitrator was bound by the agreement as alleged in the bill.

Moreover, the trial justice overlooked or misunderstood the substance of the arbitrator's testimony in the superior court. He apparently went on the assumption that the arbitrator had testified before him that the full meaning of Reilly's statement "did not register" at all on December 30, when it was being stated for the record. An examination of the arbitrator's testimony discloses that he testified, in substance, that "the full meaning of Reilly's statement did not register *until Reilly's next sentence*." (italics ours) That is far from testifying that he never understood the real meaning, or that it "did not register" at all at the arbitration proceeding. It really states that the *full meaning* of Reilly's statement, though it "did not register" at first, nevertheless was fully apprehended when Reilly's next sentence was concluded. On his own testimony, therefore, the arbitrator did understand at the arbitration proceeding Reilly's statement of the agreement for the record as made on December 30.

In the face of that testimony, it is significant that the arbitrator did not, in the arbitration proceeding, contradict or change Reilly's statement; or notify Reilly or Hall that he did not so understand it; or say that he would not be

bound by it. His only observation immediately following "Reilly's next sentence", at which time he understood its meaning, according to his own testimony, was the mere question as to time: "You don't expect me to make my interpretation *at this time* do you?" (italics ours)  Reilly, knowing that the arbitrator's previous refusal to determine upon what theory he would base his decision was the only reason why such an agreement was necessary at all, replied naturally to the effect that of course he did not expect such decision *at that time;* but that he did want to make certain that he would have an opportunity to present evidence *at any time* to meet the theory that the arbitrator might use, when, as and if such theory were different from Reilly's supposed plant theory.

Unless the arbitrator meant to notify Reilly of his own interpretation and theory before final decision, it seems obvious that the arbitrator could not reasonably give his assent to allow Reilly the opportunity of "subsequently" presenting evidence "at any time" to meet such theory, as Reilly stated and as the arbitrator expressly agreed in the record.  If the arbitrator did not decide upon his own theory until *after* the arguments, then the contemplated protection of the agreement must have been intended to apply after the arguments.  Nothing is strange or unusual about such an agreement.  "Preliminary" or "tentative" findings, with notice and opportunity to parties to be further heard, are by no means unknown in arbitration. What Reilly was stating, almost of necessity in the existing circumstances, was in effect an agreement for a preliminary or tentative interpretation of the contract, before the evidence was to be considered as finally closed.

We are of the opinion, therefore, that the trial justice himself failed to construe the undisputed language appearing in the unimpeached record of the arbitration proceeding, without relying on testimony of Hall and the arbitrator of the character which he allowed in evidence; and secondly,

that he erroneously placed upon the lighting company the burden of proving that the power company's understanding of the recorded agreement of December 30 was incorrect; and thirdly, that the trial justice, in weighing all of the evidence on this issue, apparently overlooked or misconceived the substance and effect of the arbitrator's own testimony, as hereinbefore discussed.

Moreover, in our opinion, the decree is erroneous for even stronger reasons and upon an issue which was not discussed or decided in the rescript of the trial justice. Assuming that the questioned evidence was admissible; and that the decision was made upon conflicting evidence and was correct, as far as it goes; and further conceding the power company's contentions that the agreement of procedure, as recorded in the submission to the arbitrator, "did not register" with Hall and the arbitrator; there would be, in that event, a mutual misunderstanding, and, in such circumstances, the parties did not have a full and fair hearing in a true arbitration proceeding.

It is elementary that arbitration at common law presupposes the mutual agreement of the parties. In the instant cause, the decision is based upon a finding that there was either no mutual agreement as to procedure in the submission; or that there was such an agreement between the parties, but that it was not agreed to by the arbitrator. The view of the decision taken by the power company, on its evidence and contentions, seems to rely upon the first of these possible interpretations. If there was no mutual agreement between the parties, it necessarily follows that the foundation inherent in the concept of a true arbitration is destroyed. An arbitration at common law may not be premised upon such a mutual misunderstanding as contended by the power company. Upon the power company's view there could have been no true arbitration. The more successfully the power company contends that there was *no mutual agreement* between the parties upon a vital mat-

ter in the submission, the more necessary it becomes to hold that there was no true arbitration; and therefore that the award was invalid.

Upon the second of the above possible interpretations of the decision, namely, that there was a mutual agreement of the parties in the submission but that it was not agreed to by the arbitrator, a similar conclusion is reached. The language in the rescript of the trial justice, as previously quoted, would seem to narrow his decision to this interpretation. The trial justice did not find expressly or by necessary implication that Hall and Reilly did not agree. Their agreement as to procedure in the submission was stated in the record before the arbitrator on December 2 and 30, so that the arbitrator had notice thereof. More than that, the arbitrator then and there stated in the record on December 30 his own express assent to such agreement. Since it is clear, indeed not disputed, that the arbitrator violated that agreement, if such were made, the conclusion necessarily follows in the circumstances that there was no true arbitration or valid award.

Finally, even if we assume that Hall and the arbitrator failed to understand the meaning and effect of the statement made by Reilly on December 30 in the arbitration record, as the power company contends, nevertheless it cannot successfully maintain, upon such record, that Reilly was not entitled to believe and rely on the fact that they understood the agreement, just as they specifically represented in the record. The arbitration record places that beyond dispute. Neither Hall nor the arbitrator at that time, or later, in the arbitration proceeding, made any change in the record concerning Reilly's statement of the agreement of December 30, or concerning their own representation of assent thereto. These representations by Hall and the arbitrator resulted in material prejudice to the lighting company, in that it was deprived of an opportunity to introduce material, affirmative evidence to meet the interpreta-

tion of the contract and the theory finally adopted by the arbitrator, as a basis to fix costs, efficiencies, and readjusted prices. Therefore, even assuming the correctness of the decision, as made, this controlling issue came within the pleadings and evidence, but was not decided by the trial justice. This was error. In such circumstances and on the evidence, we are of the opinion that the lighting company was entitled, in equity and justice, to the relief prayed for, provided no estoppel, waiver or laches was established to defeat it.

In our opinion none of these was proved against the lighting company, although the power company contended that all were established. So far as estoppel is concerned, we are aware of no case where that doctrine is applied to penalize an innocent party who has been misled, to his material prejudice, by the express representation of another in an unimpeached arbitration record, thus rewarding the party whose express representation of agreement in that record caused the innocent party to be misled to his prejudice. Such is not the law of estoppel under the precedents of this state. *Humes Construction Co.* v. *Philadelphia Casualty Co.*, 32 R. I. 246; *Berarducci* v. *Diano*, 60 R. I. 305.

Nor do we think that the power company has established any waiver by the lighting company. The answer of the power company admits the existence of the agreement of December 30 in the arbitration record, as alleged in the bill; but it seeks to avoid the effect of such agreement upon the ground that the lighting company intentionally relinquished a known and existing right under that agreement. The burden of proving such a waiver was clearly upon the power company.

The power company relies upon three main contentions to prove the alleged waiver by the lighting company: First, Reilly's failure to again mention such agreement after Jan-

uary 27, 1936; secondly, the alleged introduction of testimony by Reilly covering fully the theories other than the supposed plant theory, upon which Reilly insists he solely relied; and thirdly, the general nature and alleged finality of Reilly's closing argument.

The answer to the first and third of these contentions is found so clearly in Reilly's comprehensive answer to a direct question of the trial justice, while Reilly was a witness in the superior court, that we quote it:

> "Mr. Reilly: Now, Your Honor, I'll try my best to give you my frame of mind at that time. In the first place, by January 27th I had mentioned it three times and I had either the direct promise or what was tantamount to a promise by that Arbitrator that the procedure would be as indicated by me. Now of course we are all human and when you are trying a case you can't but endeavor to refrain from causing any offence to the man hearing the case. For instance, if I were before Your Honor and you promised me three times you would do a thing, I would be skirting a bit with your impatience, it strikes me, if I kept at it. It had been so definitely stated that it was a part of the stenographic record. Now then, we go on. Now I was confident, Your Honor, that I was right in this case. I was confident that our theory was the only tenable theory, coming back to it again and again; and if there was any question about our logic the thing that drove it home was the fact that Mr. Chace had said himself, not our side but one of the Power Company's Presidents, had said that was the way it was going to be done. Therefore, I was confident that we were right. Now being confident we were right there would be no reason for further evidence at all. Never any reason why I would want another scintilla of evidence if my theory was correct. Now then, furthermore, of course when you are up against a man of the type of Mr. Hall you have got to try your case and try it pretty hard and right because he leaves nothing undone. He tried his case and he was putting in evidence about Montaup and fair price and I was taking the position all

the time—they are out. Now then, the psychology appealed to me—if I had the promise of the Arbitrator in the record why should I come back at the end of the case after taking the very strong position that they were out and say: 'Your Honor, if you don't follow me, then are you going to give me another chance?' Why, I might create in the mind of that man the belief that I didn't have the confidence in my case that I did have. I didn't do it. I had no reason to do it. Because why? Because I had his promise. It was on that record and I felt I could rely on it. I hoped this case wouldn't go to where I would be called upon for more evidence. I have given you as best I can why I felt as I did."

The power company has cited no case or authority where a party to an arbitration will be held to have waived a material agreement in the submission, *merely* because that agreement is not repeatedly mentioned, after it admittedly has been once stated in the stenographic and unimpeached record of the arbitration proceeding, where it appears expressly agreed to by the other party and the arbitrator. To sustain the alleged waiver, the power company must establish it by evidence which is at least equal in value to, and as clear as, the evidence of the unqualified agreement appearing in the unimpeached record of the arbitration proceeding. No such evidence of a waiver by the lighting company appears in the record before us.

The power company relies upon the mere silence or failure of Reilly to repeat, at the final conclusion of the evidence and in his closing argument, that he was still insisting upon the agreement of December 30. Once the agreement was expressly established in the unimpeached arbitration record, Reilly had no obligation to mention it again. It required something more than mere silence to strike from the record an admitted agreement. The burden was on the power company to prove that the lighting company had intentionally relinquished its rights and protection under that agreement. In the circumstances, the power company's contention as

to Reilly's mere silence does not, in our opinion, discharge its burden on this point. The power company also seems to use this argument to support the trial justice's finding that there was no agreement as alleged. Obviously there is inconsistency in arguing for the existence and nonexistence of the agreement at one and the same time.

In arguing the second contention under its claim of waiver, the power company urges that Reilly's final argument covered exhaustively all of the evidence and all of the theories of the power company, as well as the supposed plant theory; that Reilly had presented all the evidence he desired to introduce; and that certain passages of his argument indicate that he was no longer relying upon the agreement, as he alleged. We have examined closely the final argument of Reilly in the arbitration record and we find it entirely consistent with the lighting company's theory of the contract and its attitude from the beginning, namely, that it had confined its affirmative evidence to its supposed plant theory, in reliance upon the agreement.

The power company's contention fails entirely to view that closing argument in the light of the *agreement* and the *proviso* which appear undisputed in the record, and which were relied upon by Reilly. In other words, the power company interprets Reilly's final argument on the assumption that there was no recorded agreement. This assumption is clearly contrary to fact. In closing his case, Reilly had the right to discuss all the theories and all the evidence before the arbitrator up to that time, without waiving any rights under the recorded agreement as to future possible evidence. The protection of that agreement by its terms was prospective and conditional. It depended necessarily on what theory the arbitrator would adopt. Since the arbitrator had not decided that issue up to that time, Reilly's conduct and argument were entirely consistent, *if the existence of the agreement is kept in mind.* It was

Reilly's argument and, as such, should be considered from his viewpoint of the established facts, upon which he had the right to rely, rather than from the power company's assumption, which is contrary to the established facts.

The power company also urges that Reilly did not confine his evidence to the supposed plant theory as he insists; and it cites particular testimony of certain expert witnesses for the lighting company to support its contention. This testimony was not introduced by Reilly as affirmative evidence in support of his case. It was given largely in rebuttal and upon an assumption of the basic figures presented by experts for the power company. Its purpose was to show that the power company's conclusions were erroneous even on its own figures, or at least could not effectively disturb the accuracy and correctness of the supposed plant theory and the affirmative evidence introduced thereunder.

This testimony did not supply the affirmative evidence which the lighting company wanted to introduce, in the event that the arbitrator used a theory different from the supposed plant theory. As testified to by Reilly, the lighting company claimed that, if given an opportunity under the agreement, it would have introduced affirmative evidence on the modernized Montaup and fair price theories, without relation to the supposed plant theory; and that such evidence would have produced figures basically different from those testified to by the power company's experts, upon which the arbitrator substantially relied in finding the costs and prices under his own theory.

The power company also singles out a few excerpts from Reilly's very long argument to prove that the agreement was waived. Such references, to the effect that the case had "finally reached its close", and that both parties had presented "everything which could be offered by way of

assistance to your Honor" present no great difficulty, *if the existence of the protective agreement is kept in mind.* In making them, as in his entire argument, Reilly relied upon that agreement. The first reference is largely one of form. Moreover, it was the close of evidence until the arbitrator had decided upon his own theory, and was the close of the case for Reilly if his theory was adopted by the arbitrator. Since the arbitrator had not decided up to that time what theory he would adopt, it is true, as Reilly argued in that same paragraph, that "everything which could be offered *by way of assistance* to your Honor has been presented." (italics ours) Obviously, the affirmative evidence Reilly desired to present later would not be of, assistance to the arbitrator unless and until he made known that his theory would be different from Reilly's supposed plant theory.

It should be noted, further, that Reilly, in closing that same paragraph, stated: "The *issue* is now before your Honor." (italics ours) Relying on the agreement of December 30, the one issue, not issues, that was paramount in Reilly's mind, and upon which he had based his case and argument, was whether the arbitrator was going to adopt the supposed plant theory. Upon that decision depended whether Reilly wanted to exercise his reserved right, under the agreement, to introduce further affirmative evidence "to meet the arbitrator's theory." These excerpts, properly considered in their full context and with the agreement kept in mind, do not show any such conduct as would amount to waiver of the agreement.

The power company has not established its claim of laches. Lapse of time, of itself, is an important but not a necessarily controlling element in the determination of the question of laches. *Chase* v. *Chase,* 20 R. I. 202; *Oldham* v. *Oldham,* 58 R. I. 268, 284. In the instant cause, it must be remembered that the arbitrator sailed for South America on August 22, which was the next day following the receipt

of the decision at Reilly's office; that Reilly was on vacation when the award was filed and did not actually receive it until August 27, 1936; and that the arbitrator stayed away from the United States for about two years thereafter. It is difficult to imagine what Reilly could have done to remedy the arbitrator's error, if indeed any remedy were possible in view of the finality of the arbitrator's decision and award.

Furthermore, the payments of the rates fixed by the award were made by the lighting company from the beginning *under protest* and have so continued, so that the power company had immediate notice that the lighting company intended to contest the arbitration and award. Finally, nothing has been shown in the evidence or in the argument by the power company, wherein its position has been changed or its rights adversely affected in any material way by the lapse of time between the filing of the arbitration award and the filing of this bill of complaint. The evidence here does not establish that the lighting company was guilty of laches. Upon the record presented to us, therefore, the power company is not entitled to maintain estoppel, waiver, or laches against the lighting company.

The power company also urges that the lighting company is not entitled to shift its position and raise certain points for the first time in this court. In support of this contention several Rhode Island cases have been cited. We agree with the law stated in those cases; but the instant cause is clearly distinguishable from them. The controlling questions herein were consistently presented by the lighting company by its pleadings and evidence and reasons of appeal.

For the reasons herein stated, the trial justice should have granted the prayers of the bill of complaint and set aside the arbitration award. In that view it becomes unnecessary to deal with the other reasons of appeal not specifically discussed in this opinion.

The appeal of the complainant is sustained, the award of the arbitrator is set aside and the decree appealed from is reversed.

On April 3, 1940, the parties may present for our approval a form of decree to be entered in the superior court.

Moss, J., dissenting. I cannot agree with the majority of the court in this cause. When the bill of complaint is read and interpreted in the light of the evidence submitted in support of it and in the light of the contentions in the briefs submitted to us by the lighting company, it seems to me clear that its prayer that the arbitrator's award be invalidated and set aside is based squarely on one contention, and that it has no right to such relief, unless that contention was supported by at least a preponderance of the evidence in the superior court.

That contention is that there was an agreement, which was entered into by the arbitrator and the trial attorneys of the two parties to the arbitration, and which concerned the "interpretation" of the second paragraph of Article XVI of the original contract between the parties, i. e., as to the proper method or methods of proving what should be the readjusted prices under the arbitration; and that this agreement was to the effect that if the arbitrator did not "interpret" that paragraph for the parties, determining the proper method or methods of proving costs of producing electricity, until after they had introduced all the evidence which they then respectively wished to introduce and after final arguments had been made, he would *thereafter* determine such interpretation and would then inform the parties of it and give each of them an opportunity to introduce evidence in accordance with that interpretation before he would determine the readjusted prices.

The lighting company in its bill of complaint relies upon an allegation that in connection with a more general oral

agreement, which admittedly was made, such a *special* oral agreement was made by the arbitrator and the attorneys representing the two companies, at a conference as to procedure on October 25, 1935, before hearings were begun.

There was no allegation in the bill to the effect that at any rate Reilly, the attorney who had the active charge of the lighting company's interests in the arbitration proceeding, reasonably *understood and believed* that such an agreement had been made; that in reliance upon such understanding and belief he acted as it is alleged in the bill he did act in such proceeding, to the detriment of his client's interests; and that therefore the award should be nullified.

I cannot find that any such ground for the nullification of the award was urged in behalf of the lighting company in the hearing of this cause in the superior court or was considered by the justice who there heard the cause. I find no such contention discussed or even mentioned in any of the briefs filed in this court. Nor is it in my judgment supported by a preponderance of the evidence.

In view of this situation, I am convinced that this appeal should not be disposed of upon such a ground, based upon an understanding and belief by Reilly as to what had been agreed upon.

I am also convinced that the award cannot properly be set aside on the ground that the parties had not agreed upon the rules of procedure to govern the arbitration proceeding and that therefore there was no agreement to support the arbitration. The answer to the reasoning that the award should be set aside on that ground, if found to exist, is that this arbitration was made obligatory upon the parties, under the circumstances of this case, by a provision in the *original agreement* between them; and that when it became necessary that an arbitration be held, an arbitrator was agreed upon by the parties.

Under these circumstances there was no need for the parties to agree upon rules of procedure. If they did not, the arbitrator had power to make such rules and, unless they were very unfair, they would not be a reason for setting aside the award. There is no contention here that there was any unfairness in the procedure followed by the arbitrator, unless it was contrary to an agreement of which he had knowledge. Not being convinced that the award should be nullified on either of the two grounds just discussed, I shall limit my further discussion of this cause to the contention first stated in this opinion that the arbitrator violated an agreement which he made with the attorneys for the parties.

In the superior court Reilly testified to the effect that on October 25, 1935, in the presence of Hall, the attorney for the power company in that proceeding, he stated to the arbitrator that there were a number of possible interpretations of the second paragraph of Article XVI of the contract between the parties and suggested that the arbitrator first hear the attorneys on the question of its proper interpretation, before the presentation of evidence began, and that when he had expressed his interpretation, the parties could then confine their evidence to such interpretation; but that the arbitrator declined to do that.

He testified also that he suggested that the lighting company "might pick what it considered to be the correct and proper interpretation and go ahead and introduce their evidence on that and the Power Company could go ahead and do likewise"; and that when the arbitrator came to his conclusion as to the proper interpretation, "he could inform us and if his interpretation differed from that of either one of us, we could then go forward and offer him evidence in accordance with his interpretation"; and that the arbitrator then stated that he thought that was the way to proceed. Reilly further testified that he then made the follow-

ing statement to the arbitrator: "Now, it is understood that if that happens we will have the opportunity to introduce evidence on your interpretation" and that the arbitrator agreed with that statement. Reilly also testified that he remembered a statement being made that "it was our purpose and intent to lay all the cards on the table and to give the Arbitrator a full opportunity to decide the case."

Now it should be observed that in the language above quoted, beginning "he could inform us", assuming that it was used, the words "we" and "us" evidently referred to *both* of the parties, and that the above words, "if his interpretation (*i. e.*, the arbitrator's) differed from that of either one of us", may very well have been spoken and understood as having the same meaning as if the words were "if that interpretation was not the same as the interpretation of either one of us", *i. e.*, was a new and different interpretation.

One can easily understand why the parties should be permitted to introduce further evidence in that situation, even if the arbitrator's interpretation was not made until after the presentation of evidence had been ended and the arguments for the parties, on the merits, had been concluded. If that was the sense in which Reilly's language was understood, it would naturally have made little impression on the arbitrator's memory, since he would not expect to fix prices according to a method of proof which neither of the parties had relied upon in its evidence and final arguments, unless he first gave each of them an opportunity to present evidence and arguments according to that method of proof.

That this was what Reilly meant by what he said, if he said to the arbitrator what he testified to, is made very probable by the following language at page 209 of the reply brief filed in this cause for the lighting company and bearing the names of himself and other counsel: "Counsel for appellant say that there cannot be any question that the procedural agreement which was entered into was a reason-

able and natural agreement under the circumstances. Let us assume for the argument that Mr. Reilly, at a great expense, had introduced evidence upon the 'supposed plant' theory of interpretation of the contract which he believed was the proper theory and, at a much greater expense, had introduced evidence upon a dozen other theories of interpretation; and that the Power Company had also at great expense introduced evidence on either one or a dozen theories. *Let us assume that the case was then closed and that when the arbitrator returned his award both parties found that the arbitrator had determined upon an interpretation of the contract concerning which neither party had presented any evidence.* It was exactly to prevent such a situation as this that the agreement which was recorded on December 30, 1935, was entered into. If counsel for Blackstone. and for the Power Company had failed to protect themselves against the possibility mentioned in the above illustration, it would have been most unnatural and would have been a gross neglect of the substantial rights of their respective clients." (italics in the brief)

That situation did not occur and it was not at all necessary, in order to prevent its occurrence, to require that, if the parties should not agree on an interpretation, *i. e.,* on the proper method or methods of proving costs of generating electricity, the arbitrator must make a preliminary finding of *his* interpretation and must then notify the parties of it and give each of them an opportunity to present further evidence according to the arbitrator's interpretation, even though it was the same as that of one of the parties and the other party had already had a chance to present evidence in accordance with it. It seems to me that such a requirement would have been most unusual, unreasonable and unnatural, as well as unnecessary.

As to this conference of October 25, 1935 the arbitrator testified in the instant cause as follows. He was asked this

question: "Was it at that conference on the 25th of October agreed that if it should subsequently develop that the interpretation placed on said contract by either party was different from the interpretation as subsequently determined by the Arbitrator that either party thereafter was to have the opportunity to introduce evidence to meet the Arbitrator's interpretation?" and he answered: "It was not."

The arbitrator had previously testified as follows as to this same conference: "I said I would like to get all the possible evidence I can naturally in deciding a case of this importance. Mr. Reilly said, 'Well, we haven't just made up our minds how we are going to proceed on that yet. I presume whatever method I may use in interpreting it, whatever interpretation we make, I assume Mr. Hall will have an entirely different interpretation. If he does, we want every opportunity to meet his interpretation' and I assured him that not only he, but Mr. Hall, and both sides, would be given every opportunity to present all the evidence that they desired in the case." He denied that at that conference the conversation testified to by Reilly, as above stated, occurred.

This testimony by the arbitrator was corroborated by Reilly himself, when he was cross-examined in the superior court. Hall asked him this question: "And so it is a fact, isn't it, that you said to the Arbitrator on October 25th that you did not want to be foreclosed from putting in additional figures by your engineers which might be more particularly applicable to our construction of the contract rather than to yours,—that is correct, isn't it?", and the answer was: "I think that is a fair statement."

Hall testified that "there was no agreement or understanding at the conference of October 25th, that after both parties had rested, the Arbitrator was to make a finding and was to communicate it to the parties, after which the

Lighting Company or the Power Company was to have the right to introduce other testimony."

His testimony to that effect was strongly corroborated by uncontroverted and clearly established evidence that on the very day of the conference he wrote a letter to the general counsel of the power company in which the substance of the conversation, so far as pertinent to the alleged agreement now under consideration, was stated as follows: "Mr. Reilly said that at the time of his opening he should give his construction of the contract, and should introduce evidence to support his claims as he construed the contract. He said that he realized that our construction of the contract would probably be different from his, and that he should not want to be foreclosed from putting in additional figures by his engineers which might be more particularly applicable to our construction of the contract rather than to his construction of it, because he could not know which construction Mr. Wells would adopt, and, therefore, he wanted opportunity to cover all possible constructions of it with figures. Of course, the same opportunity is open to us. Mr. Wells said that what he wanted was all of the evidence that either side had to offer in order to make his determination as to what were fair and just prices, and that we need not worry about either side being cut off in the introduction of evidence."

A copy of this letter was sent by Hall to Reilly, inclosed in a letter to the latter in which Hall said:

> "I thought perhaps you would like my recollection of our talk with Mr. Wells this afternoon, and so I am sending you a copy of the letter describing it, which I have sent to Mr. Dunn. I trust that you will find it accurate."

Reilly testified that on November 1, 1935, after he had seen Hall's letter to him and the inclosure, he made a memoran-

dum as to this conference of October 25, 1935, having previously made no notes about it.

This memorandum, being the lighting company's exhibit M, is entitled "Resumé of Topics Discussed at Conference October 25, 1935." Its first three sections are in substance the same as what is set forth in Hall's letter to the general counsel of the power company. The fourth section is as follows:

> "When Blackstone opens, it is to give its construction of the contract forthwith, and then will introduce evidence to support its claim under such construction. Rhode Island Power Company will do likewise. When the Arbitrator has indicated what his construction of the contract is, either party is to have a full opportunity to introduce whatever evidence may be necessary to meet that construction."

It should be noticed that there was nothing like this in Hall's letter and that both Hall and the arbitrator testified that no such agreement was made at the conference in question. The word "necessary" in the last line of the above quotation should also be noticed. Unless the arbitrator's construction should prove to be different from every construction relied upon by either of the parties, it would not be "necessary" for either party to introduce any evidence to meet the arbitrator's construction, because such party would already have had the opportunity to introduce evidence to meet that construction, which would have been relied upon by one or the other of the parties.

After a little more testimony of no special importance Reilly, on cross-examination by Hall, testified that this difference between his memorandum and Hall's letter to the general counsel of the power company was "vital and very important"; and testified also that the agreement was more with the arbitrator, and that he, Reilly, thought there was no particular reason for putting that in writing between

him and Hall, "for it was certainly well understood between us at the time, and therefore I didn't reply to your letter. I felt a reply was not called for."

Further along in his testimony he was asked by Hall why he never answered Hall's letter or called Hall's attention to this difference between their two statements of what occurred at the conference. His reply was: "There was no question about it then as to what the procedure was, and I didn't give it sufficient significance to feel that it was necessary to write to you about it."

I have difficulty in understanding how he could have failed to appreciate the great significance of this difference, unless he meant the last sentence of the fourth section of his resumé to cover only the contingency that the arbitrator should decide in favor of a new and different construction of his own. I believe that this is what he did mean. If he did not, I feel that the weight to be given to his testimony in this cause is very much lessened by this evidence of Hall's letter to Reilly, with its inclosure, and Reilly's failure to answer it or to communicate with Hall with regard to the subject-matter of them, and by Reilly's explanations of that failure.

The next evidence that tends to throw any light upon the question of what was included in the agreement of October 25, 1935, is the statement by Reilly, which was made by him to the arbitrator at the close of the hearing on December 2, 1935, when Reilly had completed what he called his *prima facie* case, consisting of evidence from one of his expert witnesses, and which was recorded in the transcript of the arbitration proceeding. This statement was that "in keeping with the expression which you made at the time of our conference, our (*i. e.,* Reilly's and his associate Hunt's) desire naturally is that we shall ultimately have before you the strongest interpretation and all that can be

said in regard thereto; and secondly, all the evidence bearing upon our interpretation, as long as it holds before your Honor, and such evidence as we may see fit to produce upon an interpretation of the contract, if it varies from either that of ourselves or Mr. Hall."

It seems clear to me that Reilly, by the use of the words "the strongest interpretation", recognized that there were probably several *proper* methods of proving the costs of generating electricity; and that he desired to use the method which he believed would be most convincing to the arbitrator. It also seems to me that by the language which follows the semicolon in his statement above quoted he meant that he would rely upon that method of proof, unless and until the arbitrator held it to be improper, a contingency which did not happen, because the language of the award clearly shows that the arbitrator considered and gave weight to the evidence which Reilly submitted on his own selected method of proof, on the supposed plant theory, as well as to the evidence which was submitted on the modernized Montaup and fair price theories.

As to the last clause quoted above, it is my opinion that the natural and reasonable meaning of it is that if the arbitrator should decide in favor of an interpretation which was not like any advocated by the counsel for either party, also a contingency which did not happen, the lighting company's counsel could then introduce such evidence as they saw fit to produce upon the arbitrator's interpretation. Indeed, the only other possible construction of the language would make it provide, among other things, that if the arbitrator should decide in favor of the lighting company's interpretation, it could introduce all the evidence that it might see fit to produce upon what had been its own interpretation, a rather absurd result.

I am therefore of the opinion that the above-quoted statement by Reilly on December 2, 1935 gives very little, if any,

support to the version relied on by the lighting company, in the instant cause, of the agreement that was made on October 25, 1935.

The next matter to be considered is the effect of the colloquy of December 30, which is quoted in the opinion of the majority of the court.

It seems clear from the first sentence by Reilly that in the rest of what he said in this colloquy he was not stating a new agreement by the arbitrator and the attorneys for the parties but merely his understanding of the substance of what had been agreed upon on October 25, 1935. It seems to me, therefore, that it was only evidence of what the previous agreement was.

As to that part of Reilly's first statement, of his understanding, which precedes the words "and, in fact", it is my opinion that the natural and reasonable meaning of it was the same as that of the middle part of Reilly's statement on December 2, 1935, as above set forth, namely, that if the arbitrator should decide that the method which Reilly was relying upon, as the best method of proving costs of generating electricity, was not a proper method under the contract between the parties, (a contingency which did not happen), he would have the opportunity to introduce evidence according to a different method approved by the arbitrator.

Moreover, it is, in my opinion, very doubtful whether the language of that part of Reilly's statement could reasonably be construed as meaning that the agreement covered not only the period up to the time when the parties had put in all the evidence which they wished to put in before arguments on the merits and had made their final arguments and submitted the case to the arbitrator for decision on its merits, but also the period *after* that time.

It also seems to me that the rest of the same sentence, beginning with the words "and, in fact", was, and would

naturally be understood by Hall and the arbitrator to be, a broader and more general statement of what Reilly had just said had been agreed to on October 25; and that the words "at any time" therein would not naturally, in connection with the context, be meant or understood as including the time after the making of final arguments. Therefore the arbitrator, when he said: "That is as I understood it at the time of the conversation", might very reasonably have understood, and probably did understand, that Reilly's entire sentence referred only to the period before the case was argued on its merits, as I am strongly inclined to believe that it did.

It also seems to me that what he meant by the middle part of his long statement of his understanding was that if the arbitrator should rule out, as improper, the method which was relied on by Reilly for proving costs of generating electricity, Reilly should have the opportunity to prove such costs by a method approved by the arbitrator. This would be in accordance with what Reilly said on December 2, 1935, as above discussed.

As I have said above, the arbitrator in his award recognized, as proper, no interpretation which had not been relied on by at least one of the parties to the arbitration. And the lighting company had had, and *had used* the opportunity to introduce evidence to "meet" the Montaup methods of proving costs of generating electricity, in just the same way as the power company met the supposed plant method, and the lighting company had itself introduced some evidence upon the fair price method of proof.

The arbitrator testified in the instant cause that when he spoke, as above quoted in the opinion of the court, he did so with the latter part of Reilly's statement in mind, (evidently referring to the part beginning wtih "and, in fact"); and that the previous part of the statement had not "registered" with him, and that it did not "register" until

Reilly had made his next statement. Thereupon the arbitrator, evidently trying to find out what Reilly really meant, said: "You do not expect the arbitrator to make any decision at this time as to what his interpretation is?" Reilly then answered, as quoted in the opinion of the court, in language that could only be reasonably construed, it seems to me, as referring exclusively to the period *before* the case should be argued on its merits.

In that language he was summing up all that he had said before in the colloquy; and because of his use of the word "merely", what he said was equivalent to saying that *all* that he wanted to be sure of was that it was understood between the arbitrator and the attorneys that at any time the attorneys might continue to go forward on any subject or in any way that they thought would be helpful to the arbitrator in deciding the case.

It should be noticed that in that language the procedure agreed upon on October 25 was stated in substantially the same way as it was stated in the arbitrator's testimony as to what was agreed to on that earlier date, and as it was stated in Hall's testimony and in his letter, above discussed, to the chief counsel of the power company. All pertinent things considered, I find that the recorded conversation constituting the colloquy lessened very little, if at all, the weight to be given to the evidence in favor of the power company which I discussed *supra* before discussing that conversation.

As to the agreement which is alleged in paragraph 10 of the bill of complaint to have been made by the arbitrator with Reilly during the period when the power company was introducing its evidence, Reilly testified that such an agreement was made orally on January 27, 1936, though it was not recorded. His testimony was supported by that of one of the expert witnesses for the lighting company, and somewhat supported by that of another of them. On the other hand, the arbitrator denied that such an agreement was

made and his denial was supported by the testimony of Hall and at least two other witnesses for the power company.

This testimony by Reilly and his two supporting witnesses is, in my judgment, the only evidence which, if believed, proved an agreement by the arbitrator to make, after final arguments, if not before, a preliminary interpretation of the contract between the parties, as to the method or methods of determining the readjusted prices of electricity, and then to permit the parties to introduce further evidence.

The trial justice made no specific finding either way as to this alleged agreement of January 27. Near the end of his rescript, just before giving a resumé of the arbitrator's testimony as to the alleged agreements of October 25, 1935 and January 27, 1936, he stated that he was much impressed by the arbitrator's testimony. It is clear from his rescript that he did not believe that any such agreement was made on the latter date as was alleged in the bill of complaint; and I cannot find that the alleged agreement was supported by a preponderance of the evidence.

Rejecting, as not proved, this alleged conversation between Reilly and the arbitrator, I find nothing whatever in the language or conduct of any of the attorneys or of the arbitrator, after December 30, 1935 and before the institution of this suit, which gives any support to the contention that any such agreement was made by the arbitrator, and I find much to the contrary.

So far as appears from the record of the proceeding and evidence before the arbitrator and the record of proceedings and evidence before the superior court, with the single exception of the alleged conversation of January 27, 1936, no reference whatever to such an agreement was made by anybody connected with the case during the above period.

Although, according to the bill of complaint and the testimony of Reilly, the alleged agreement relied on by him in

the instant cause, was for the benefit of either party, Hall never, during that period, alluded to any such agreement in his handling of the case before the arbitrator, but introduced a great deal of evidence in opposition to the evidence which Reilly had introduced upon his supposed plant theory.

So also the latter, on March 9, 1936, put the following question to one of his expert witnesses: "Having in mind your opinion that the power furnished under the 1914 contract is unrelayed power, what in your opinion is a fair price for this power on July 1, 1935, in view of the state of the art and methods of generating on that date?" This question clearly called for evidence in accordance with the fair price theory advocated by the power company, and it brought out evidence in favor of the lighting company in accordance with that theory.

As to the modernized Montaup theory, advocated by the power company, the Montaup plant being located at Somerset, Massachusetts, Reilly said in his final argument before the arbitrator: "We believe we have demonstrated in our testimony, as given on pages 1144 to 1150, the fallaciousness of the Power Company's reasoning as to the Somerset costs" and then referred to the evidence, introduced by him, on which he relied in making that statement.

There was considerable evidence introduced by Reilly before the arbitrator in rebuttal of evidence by Hall's witnesses as to costs under the theory of modernized Montaup. This evidence was to the effect that proper elements in the determination of costs under that theory had been omitted and improper ones had been used and that much of the reasoning of Hall's witnesses was erroneous. In this connection the following quotation from the opening statement for the lighting company in the instant cause is illuminating: "We shall show to the Court that Blackstone did not attempt to produce and did not produce evidence to *fully and completely* meet the evidence of the Power Company on the

so-called Montaup cost theory and the so-called fair price theory." (italics mine)

At least a large part of the evidence which, according to Reilly's testimony and argument in the superior court, he would have introduced before the arbitrator, if he had not expected the latter to make a preliminary interpretation of the contract, was purely cumulative. A substantial part of this evidence was on the issue whether, on the theory of modernized Montaup, the plant should have coal-burning as well as oil-burning equipment; and as to that issue he had already introduced enough to cause the arbitrator to decide that issue in favor of the lighting company. I find that his argument, based on the evidence which Reilly might have put in before the arbitrator, but did not, gives little, if any, support to his contention that there was an agreement for a preliminary interpretation by the arbitrator.

That alleged agreement was never mentioned by Hall in his final argument before the arbitrator, in which he covered every phase of the case and which takes up three hundred and twenty-five pages of the transcript. He evidently was urging the arbitrator to fix the readjusted prices on the evidence submitted and never suggested that the arbitrator, under any circumstances, should make a preliminary interpretation of the contract and permit either party to submit any further evidence.

The same things are true as to Reilly's final argument, which takes up two hundred fifteen pages of the transcript. On his own testimony he never, after January 27, 1936, mentioned in the arbitration proceeding any agreement with the arbitrator for a preliminary interpretation of the contract. When, on May 28, 1936, he put in his last evidence, he said to the arbitrator: "No further questions. That closes our evidence, your Honor."

As set forth above, Reilly, in the "colloquy" of December 30, 1935, said that his understanding was that it was

"agreed . . . that both the Lighting Company and the Power Company might at any time, and to such length as they saw fit, introduce evidence which they thought would be helpful to your Honor."

Near the end of his final argument he said: "And so, after many weeks of careful study and work, both in preparing and presenting this case, we have finally reached its close. Everything which could be offered by way of assistance to your Honor has been offered by the Lighting Company and I am sure also has been offered by the Power Company. As was stated early in the case, there has been a serious endeavor to lay all of the cards on the table. The issue is now before your Honor for determination." It seems to me that the only reasonable meaning to give to the word "issue" as thus used would make it include the fixing of prices for electricity.

It also seems to me that there is an inconsistency between the above statement by Reilly, that there had been a serious endeavor to lay all of the cards on the table, and certain testimony by him in the instant cause, to the effect that, when he made this statement, he had considerable evidence on Hall's theories of proof, but did not introduce it because he believed that he could introduce it later, if the arbitrator held those theories to be proper.

At the very end of his argument, he restated the lighting company's interpretation of the contract between the parties as to the proper way to determine the readjusted prices of electricity and said that the power company had attacked the lighting company's contentions; but he made no statement to the arbitrator that if the latter decided in favor of a different interpretation of the contract in this regard, the parties were to be notified of this decision and permitted to introduce evidence on the arbitrator's interpretation.

In his final argument Hall a number of times argued that Reilly's witnesses had made a poor showing in attacking the

prices which Hall's witnesses had derived on the modernized Montaup theory and in trying to show that these figures were not correct because Hall's witnesses had overlooked or figured incorrectly certain elements entering into costs. Yet Reilly never once stated that he had not seriously tried to show the inaccuracies in the figuring of prices on the modernized Montaup theory, and that his reason for not trying to do so was because he felt sure that the arbitrator would not approve that theory and that if the arbitrator, notwithstanding, *did* approve it, he would, before fixing prices, give both parties a chance to introduce testimony based upon it.

Suppose that it *had* been agreed that the arbitrator was to make a preliminary finding on the proper method or methods of proof for determining the readjusted prices and that then, even if his method or methods should be like one or more of theirs, he was to permit the parties to introduce evidence in accordance with the method or methods thus found by him to be proper. In that situation it seems to me very improbable that the parties would, at the same hearing, have argued, *as they did*, not only the question of the proper method or methods of proof but also the question of what would be the proper readjusted prices according to the methods of proof advocated by the respective parties. The only natural and reasonable way to proceed would have been to postpone the arguments on *prices* until after the proper method or methods of proof had been determined and all the evidence for the parties had been introduced accordingly.

That the arbitrator did not understand that he was to make a preliminary finding on methods of proof seems to me strongly indicated by the fact that, after the closing arguments had been made by counsel, he said to them: "I hope that you gentlemen will realize that it will require a careful study and analysis of all of the exhibits and of all of the evidence *in order for me to come to a final decision.* I think I realize the importance to both sides of this case, and I

assure you that, to the extent of my limited ability, I shall do my utmost to arrive at a fair conclusion." (italics mine) Yet Reilly did not reply that the arbitrator was to make a preliminary finding on methods of proof and let the parties put in further evidence before he came to a *final* decision.

Reilly, in the superior court, testified in substance that at the time of the above final arguments he had in mind the agreement of the arbitrator to do just that, but that he did not mention it, because he felt that to do so would weaken his case before the arbitrator. This explanation is not convincing to me; and I feel that his failure to mention such an agreement at that time is a strong reason for concluding that he was not relying on any such agreement.

I also feel that Reilly's failure, after he had received the decision and award of the arbitrator, to make any protest to the latter or to the power company that the arbitrator had violated such agreement, though he knew how to get the latter's address, and the fact that he did not, for nearly a year, begin proceedings to have the award set aside, militate against his contention that such an agreement was made.

It was natural that, pending a careful examination and consideration of the award, he should advise his client to make payments to the power company, *under protest,* for electricity at the readjusted prices fixed by the arbitrator. But I find difficulty in understanding why he should wait so long before raising the question of the misconduct of the arbitrator in violating the alleged agreement for a preliminary finding, if there was such an agreement.

I have found no opinion by this court in which the question of the extent of the burden of proof, in a suit in equity to have an arbitration award set aside, is discussed; but it appears to be well settled by the great weight of authority elsewhere that courts exercising equitable jurisdiction are very reluctant to set aside awards by arbitrators and will do so only upon clear and convincing evidence of fraud, mis-

conduct, partiality or the like. *Liggett* v. *Lorrington Building Co.,* 114 Conn. 425, 158 A. 917; *Brush* v. *Fisher,* 70 Mich. 469, 38 N. W. 446 (1888); *Hooper* v. *Pennick,* 102 Or. 382, 202 P. 743; *Hardeman* v. *Burge,* 10 Yerg. (Tenn.) 202.

The following statement in *Brush* v. *Fisher, supra,* is typical: "Courts, however, favor awards made by tribunals of the parties' own choosing, and are reluctant to set them aside, and every presumption will be made in favor of their fairness, and the burden of proof is upon the party seeking to set them aside, and the proof must be clear and strong."

After consideration of the evidence in this cause, I am of the opinion that the decision of the justice of the superior court that the complainant had not proved by a fair preponderance of the testimony and evidence that the agreement of October 25, 1935, was entered into by the arbitrator as alleged in the bill of complaint is not clearly wrong. Therefore, I find that none of the complainant's reasons of appeal that are based on the contentions that the final decision and the findings therein and the decree of the superior court are against the evidence and the weight thereof and against the law, should be sustained.

After considering the other reasons of appeal, I am of the opinion that there is no merit in any of them and that none of them should be sustained.

My final conclusion is that the decree appealed from should be affirmed and that the cause should be remanded to the superior court for further proceedings.

MR. JUSTICE BAKER concurs in the opinion of Moss, J.

————

PER CURIAM. After the opinion in this case was filed, the respondent, by leave of court, was permitted to file its motion for reargument. That motion points out certain alleged inaccurate statements of fact appearing in the opin-

ion which, it infers, formed at least one of the material bases for the court's opinion. In effect, the respondent contends that a reargument should be granted because of the court's alleged misconception of certain facts.

We have examined the portions of the opinion referred to and find that, in attempting to compress into a few paragraphs or pages the statement of what was included in many volumes of evidence and contentions, a few inadvertent errors crept into the opinion. These statements occurred largely in setting out the travel, facts and contentions of the parties rather than in the holdings of the opinion. In any event, none of these alleged errors are material to or form the ultimate basis for any important conclusion which was reached and elsewhere expressed clearly in the opinion.

Thus, for example, whether the complainant contended that the contract called for fixing the cost of electricity that was *secondary,* instead of *primary* as was inadvertently stated, was merely a part of the statement of one of the contentions and was immaterial. It did not concern any ultimate basis for our opinion. The cause, as argued by both parties and as decided in the opinion, revolved around the statement in the arbitration record on December 30, 1935 of an agreement as part of the submission, and the express representations by the respondent and arbitrator of their assent thereto, followed by the complainant's reliance thereon and the arbitrator's failure to comply therewith in making his award.

Similarly, whether the arbitrator was absent from the United States for the greater part of *one* year, rather than *two* as incorrectly stated, after he filed the final award, is not the important and ultimate reason given in the opinion for our refusal to invoke the doctrine of laches against the complainant. The payment of the award by complainant *under protest* from the beginning, and the *finality* of the award as filed, were not affected by the arbitrator's absence for eight

or twenty months. Apart from such reasons, the statement of the actual fact of the arbitrator's immediate sailing and absence was merely an additional and natural answer to respondent's claim as it was argued.

The motion also infers that the court, in dealing with respondent's claim of laches and estoppel, overlooked certain evidence of taxes paid to the state by respondent on its gross earnings. These included taxes on the excess amount of the adjusted prices paid to it by complainant under the award. The respondent argues in effect that the opinion overlooked this fact and misstated that the respondent's position was not changed or its rights adversely affected. This argument fails to recognize that the opinion actually stated that the respondent's rights were not adversely affected *in any material way* by the lapse of time between the award and filing of the bill. In our opinion, the evidence of payment by the respondent, without protest or other qualification, of taxes amounting in all to only $105.20 after notice from the complainant that its payments under the award were being made *under protest,* did not constitute such a material and adverse change in the respondent's position or rights as to justify our holding that the complainant was thereby barred from its remedy because of laches or estoppel.

The motion further infers substantially that our ultimate conclusion was based erroneously upon a misconception that the arbitrator's award was based upon a total disregard of the lighting company's contention and evidence relating to the costs in the supposed plant at Pawtucket. We do not think that the opinion states it just that way or that a close reading of the whole opinion and the award, as made, justifies such an inference. The arbitration award itself, concerning which we were then speaking, shows that the arbitrator considered the complainant's contention in a sense; but it also shows that he did not make his final award in accordance therewith or as called for by the agreement as stated in

the arbitration record. Moreover, whether he dismissed it *in whole* or *in part* was really immaterial, so far as the agreement on December 30 in the arbitration record was concerned. It is clear from the award itself, and also from this motion, that the final award was not in accordance with the complainant's contention that the hypothetical or supposed plant at Pawtucket was the *only* basis upon which the cost, efficiencies, and prices could be readjusted under Article XVI.

The motion admits that the two other statements referred to are plainly inadvertent errors and wholly immaterial to the reasoning or conclusions of the opinion. However, in the interest of a precise statement of the travel, facts and contentions of the parties, it is desirable that they and the other inconsequential errors be corrected to conform with the evidence of the exact facts. The court appreciates the effort of counsel in calling these matters to our attention for correction; but as none of them in any event constituted any ultimate and fundamental basis for the opinion, which we think is clear from the opinion itself, the motion does not present any sufficient ground for reargument.

Motion denied.

*Tillinghast, Morrissey & Flynn, Daniel H. Morrissey, Robert J. Conley, John M. Dunn, William A. Graham, Gaston, Snow, Hunt, Rice & Boyd, James C. Reilly,* for complainant.

*Ira L. Letts, Hogan & Hogan, Damon E. Hall,* for respondent.