LOCAL 63, TEXTILE WORKERS UNION OF AMERICA, C.I.O. *v.* CHENEY BROTHERS

INGLIS, C. J., O'SULLIVAN, WYNNE, DALY and MOLLOY, JS.

■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■

Argued March 3—decided May 18—reargued October 14—
memorandum on reargument filed November 9, 1954

■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■

*Wesley A. Sturges,* with whom were *Pomeroy Day*
and *William K. Cole,* for the appellant (defendant).

*A. A. Ribicoff* and *Irving S. Ribicoff,* with whom
was *Louise H. Hunt,* for the appellee (plaintiff).

INGLIS, C. J.  The judicial phase of the controversy
between the parties to this appeal began on January
15, 1953, when the plaintiff, acting under § 8161 (d)
of the General Statutes, applied to the Superior
Court to vacate an arbitration award rendered
against it and in favor of the defendant.  The latter
filed an answer and a cross application in which cor-
rection and confirmation of the award, as corrected,
were sought.  The court decided that the award
ought to be vacated.  From the judgment entered
thereon the defendant has appealed.

The finding, which is not subject to correction, recites the following facts: For many years, the defendant, hereinafter called the company, has operated a textile plant in Manchester and, since 1937, has recognized the plaintiff, hereinafter called the union, as the bargaining representative of its production and maintenance employees. Long-term agreements affecting the labor relations of the parties were successively concluded by them as of March 30, 1942, August 1, 1947, and August 1, 1952. All three agreements contained a provision permitting either party at any time to reopen the question of wages and to seek a revision of the previously established rates. It was further provided that, if the union objected to any request by the company for a reduction in wages, the differences between the parties were to be resolved by proceedings culminating, when necessary, in arbitration under the industrial arbitration rules of the American Arbitration Association.

On March 26, 1951, as a result of negotiations between the parties, the company gave a general wage increase to about 1600 employees. The increase did not affect about twenty engravers. The hourly rate employees, that is, those compensated on the basis of a definite amount of money for each hour worked, were now to receive a flat 9.75 cents an hour more. The rates of pay for all other employees except engravers were then computed so as to give them an increase comparable to the 9.75 cents per hour. Since the wages of pieceworkers were determined, not by the number of hours worked, but by the number of units produced during a given unit of time, the fixing of the many thousands of piece rates prevailing in the plant to conform to the increase of 9.75 cents in the hourly rate had to be done by intricate mathe-

matical computation. The upshot of the wage increase of March 26, 1951, was as follows: (1) Hourly rate employees, totaling 850, were to receive 9.75 cents an hour more; (2) 20 engravers were to get no additional pay; (3) "base rates" for pieceworkers, totaling 750, were fixed at an amount which would produce an average increase of 8.1 cents an hour; (4) the "hiring rate"[1] was increased 6 cents an hour and affected 10 employees; (5) the "minimum rate"[1] was increased 5 cents an hour and affected 40 employees. The increases thus granted represented an estimated average of 9.75 cents per hour for all the employees affected. In actuality, many received more and many less than this average. As a result of the various computations, however, the over-all increase described as 9.75 cents per hour was considered to be approximated for all employees involved.

As of the date the wage increase became effective, the parties incorporated into their bargaining agreement a cost-of-living "escalator" clause. A 1 cent quarterly wage adjustment, up or down, was automatically to follow every change of 1.153 points in the consumer price index of the United States bureau of labor statistics, but no adjustment which would reduce the rates of pay below those which were effective on March 26, 1951, was to be made through this process.

On September 17, 1952, the company proposed (1) a wage reduction to offset the increase granted on March 26, 1951, and (2) a revision of the escalator

---

[1] New and inexperienced employees were paid at an hourly rate called the "hiring minimum" for a beginning period of not more than six weeks, after which the lowest wage that any production or maintenance employee (whether on an hourly or piece rate) could receive was a somewhat higher hourly rate called the "plant minimum" rate.

clause. Both proposals were rejected. The company then asked the union to join in submitting the dispute to arbitration under the agreement, but the union refused to do so. On October 10, 1952, the company forwarded a written request for arbitration to the American Arbitration Association and sent a copy thereof to the union. The request was for the arbitration of two matters, expressed by the company in the following language:

"1. A direct wage decrease of 9 ¾ cents per hour for all employees covered by the current agreement, to offset the wage increase which became effective on March 26, 1951.

"2. Revision of our cost of living formula (Section 9 of the current agreement) by providing for adjustment upon each change of 1.32 points in the applicable index instead of 1.153 points."

In conformity with its rules, the American Arbitration Association selected an arbitrator who, on November 25 and 26, 1952, held hearings in which both the company and the union participated. At these hearings the arbitrator was not advised of the meaning of "hourly rates," "base rates," "piece rates," "plant minimum rates" and "hiring minimum rates," as those expressions were used by the company in its wage structure, nor was he told of the method by which the wage increase of March 26, 1951, was computed and fixed for the various types of wage earners.

On December 28, 1952, the arbitrator made the following award:

"1. Beginning with the first payroll period which commences after December 31, 1952, all hourly rates and base rates shall be reduced by 9.75 cents. Piece rates and plant hiring minimum rates shall be adjusted accordingly.

"2. Beginning with the first payroll period which commences after December 31, 1952, Section 9 of the collective bargaining agreement between the parties dated August 1, 1952 shall be modified so as to provide for a 1 cent cost-of-living adjustment for every 1.32 index points' change in the U. S. Bureau of Labor Statistics Consumers' Price Index for Moderate Income Families in Large Cities, Old Series. The February 1951 Index of 184.2 shall continue to be used as the starting point in calculating changes in the cost of living. The effect of this will be to reduce the Cost-Of-Living Allowance payable for the current quarter from 7 cents to 6 cents per hour."

Although the rules of the arbitration permitted but did not require it, the arbitrator delivered with the award, and stapled to it, a twenty-two page opinion. As directed in the first paragraph of the award, a reduction of 9.75 cents an hour in all "base rates," as that expression is used and applied in the company's wage system, would result in an average decrease of substantially 11.7 cents per hour in the actual earnings of pieceworkers. This decrease would affect 750 employees. Certain other facts found by the court will be mentioned when the legal claims advanced by the parties are discussed.

The problems presented by this appeal readily group themselves into two main divisions, of which one deals exclusively with the first, and the other with the second, paragraph of the award. The court concluded that the former was void because it went beyond the submission and, in any event, because it was not a final and definite answer to the question to which it purported to respond.

Early in our judicial history we expressed the view that, since arbitration is designed to prevent litigation, it commands much favor from the law.

*Parmelee* v. *Allen,* 32 Conn. 115, 116; see *Mallory* v. *Town of Huntington,* 64 Conn. 88, 95, 29 A. 245. Especially is it to be encouraged as a means of promoting tranquility and the prompt and equitable settlement of disputes in the field of labor relations. *Colt's Industrial Union* v. *Colt's Mfg. Co.,* 137 Conn. 305, 309, 77 A.2d 301. It is true, however, that the submission should set forth the questions to be resolved in such a manner as to show clearly what disputes are to be arbitrated. *International Brotherhood of Teamsters* v. *Shapiro,* 138 Conn. 57, 68, 82 A.2d 345. Clarity is important because the source of the arbitrator's authority is found in the agreement of submission. "The charter of an arbitrator is the submission and no matter outside the submission may be included in the award. *Palmer* v. *Green,* 6 Conn. 14, 18; *Hamlin* v. *Norwich,* 40 Conn. 13, 23; *Schoolnick* v. *Finman,* 108 Conn. 478, 481, 144 A. 41; Sturges, Commercial Arbitrations & Awards, pp. 144, 229; Russell, Arbitration & Award (13th Ed.) pp. 201, 210, 211." *Pratt, Read & Co.* v. *United Furniture Workers,* 136 Conn. 205, 208, 7 A.2d 120.

It necessarily follows that an award must conform to the submission. *Chase Brass & Copper Co.* v. *Chase Brass & Copper Workers Union,* 139 Conn. 591, 594, 96 A.2d 209; *Continental Milling & Feed Co.* v. *Doughnut Corporation,* 186 Md. 669, 677, 48 A.2d 447; *Baldwin* v. *Moses,* 319 Mass. 401, 402, 66 N.E.2d 24; 6 Williston, Contracts (Rev. Ed.) § 1929. Ordinarily, an award which does not respond to the submission cannot be upheld. *Blackstone Valley Gas & Electric Co.* v. *Rhode Island Power Transmission Co.,* 64 R.I. 204, 223, 12 A.2d 739; *Pumphrey* v. *Pumphrey,* 172 Md. 323, 325, 191 A. 235. It is void to the extent to which it is outside the submission. *Matter of Marchant* v. *Mead-Morrison Mfg. Co.,*

252 N.Y. 284, 301, 169 N.E. 386. To that extent the award must be vacated by the Superior Court upon proper application. General Statutes § 8161 (d).

On the other hand, if part of an award is within the submission and part of it is not, the former may be sustained and the latter rejected if the two can be separated without doing an injustice. *Parmelee* v. *Allen,* 32 Conn. 115, 116; *Moore* v. *Luckess' Next of Kin,* 64 Va. 160, 171; *Moyer* v. *Van-Dye-Way Corporation,* 126 F.2d 339, 341; 6 Williston, Contracts (Rev. Ed.) p. 5395; Sturges, Commercial Arbitrations & Awards, § 226; 3 Am. Jur. 957; 6 C.J.S. 234; see *Dutton* v. *Gillet,* 5 Conn. 172, 175 n. In accord with this principle, § 8162 of the General Statutes provides that the Superior Court may modify or correct an award "(b) if the arbitrators shall have awarded upon a matter not submitted to them unless it be a matter not affecting the merits of the decision upon the matters submitted," and that "[t]he order shall modify and correct the award, so as to effect the intent thereof and promote justice between the parties." The use of the word "unless" in this portion of the statute is confusing, but obviously the intendment of the enactment is that the court may strike out such portion of an award as is not responsive to the submission if, by so doing, the merits of the portion of the award which is within the submission are not affected.

We will first apply the principles of law which we have just recognized to the question whether the award made upon the first paragraph of the submission should be corrected and, as corrected, sustained. The submission itself is inartificially drafted. It does not necessarily follow, however, that it is insufficient to form the basis of an award. *Matter of Hub Industries (George Mfg. Corporation),* 183

Misc. 767, 769, 54 N.Y.S.2d 106, modified, 269 App. Div. 177, 54 N.Y.S.2d 741, aff'd, 294 N.Y. 897, 63 N.E.2d 28. It sets forth with reasonable clarity that the gist of the question to be arbitrated is whether there should be such an adjustment in the wage scale of the defendant as would offset the wage increase of March 26, 1951. It is true that it indicates that such an adjustment may be accomplished by a direct decrease of 9.75 cents per hour for all employees. This latter portion of the submission, if taken literally, is inconsistent with the former. As has already been shown, if the pieceworkers, the employees on the hiring rate and those on the plant minimum rate were all reduced by 9.75 cents per hour, their wages would be less than they were prior to March 26, 1951. When, however, it is borne in mind that the raises granted in 1951 were all computed by starting with a raise of 9.75 cents per hour for the hourly employees, it becomes clear that there is no inconsistency between the two concepts expressed in the first paragraph of the submission. A reduction of 9.75 cents per hour in the hourly rates paid would come to the same end as a reversion to the wage structure as it was prior to March 26, 1951, if the reduction in the hourly rates is taken as a base for the computation of the reduction in the pay of those workers not on an hourly basis, just as an increase of 9.75 cents an hour for the hourly workers was taken as a base for the increase in the pay of all other workers on March 26, 1951. We therefore repeat that the question submitted to the arbitrator was whether the wage increase of March 26, 1951, should be offset by a basic reduction of 9.75 cents per hour, from which basic reduction the actual reduction of the pay of each employee could be computed by adjustment.

The next question is whether the award is within the submission. In one particular it is not. The arbitrator decided that not only hourly rates but also "base rates" should be reduced by 9.75 cents. In the submission nothing was said concerning base rates. Indeed, it is found by the trial court that nothing was said about any such rates in the course of the hearings before the arbitrator. Just what the arbitrator meant by his reference to "base rates" is, therefore, uncertain. However that may be, the bald fact is that any award which the arbitrator attempted to make concerning base rates was entirely outside of the submission. Consequently, under § 8162 (b) and the authorities cited above, the award should be modified by striking therefrom all reference to "base rates" if that can be done without affecting the merits of the balance of the award or doing an injustice to the parties.

If the words "and base rates" are stricken from the award, there is left an adjudication that all hourly rates shall be reduced 9.75 cents, and piece rates and plant hiring minimum rates adjusted accordingly. This adjudication is a complete and reasonably definitive award. See *Brown* v. *Wheeler,* 17 Conn. 345, 352. The phrase "plant hiring minimum rates" in the award is clearly intended to embrace both hiring rates and plant minimum rates. When so interpreted, the award covers the pay of all classes of the defendant's employees except engravers. The effect of it is to direct a reduction in the pay of hourly workers by 9.75 cents per hour and a corresponding reduction in the pay of pieceworkers, employees who are on the hiring pay basis and employees who are receiving the plant minimum wage. The reduction in the pay of the last three groups is not to be 9.75 cents per hour; it is to be a

reduction computed so that it will be equivalent to a reduction of 9.75 cents per hour in the pay of hourly workers. In effect, therefore, the award is that the pay of each of these four classes of employees shall be reduced by an amount that will offset the increases they received as of March 26, 1951.

So far as the engravers are concerned, there is nothing specifically said about them in the submission. Inasmuch as the crux of the submission was the question whether the increases in pay of March 26, 1951, should be offset and inasmuch as the engravers received no increase at that time, it cannot fairly be said that any question concerning their pay was involved in the submission. It follows that nothing in the award can be interpreted as an order for a reduction of their pay.

Thus it appears that the award without the words "and base rates" is a complete award answering the question submitted in the affirmative. It is also clear that inasmuch as no consideration of base rates, whatever they may be, was had on the hearing, the removal of all reference to them from the award cannot affect the merits of the decision of the arbitrator concerning the reduction in the pay of the four classes of employees covered by the award. The trial court was, therefore, in error in refusing to correct the award by removing from it the reference to base rates. When so corrected, the award would have been within the submission.

We next consider the second ground upon which the trial court concluded that the first paragraph of the award should be vacated, i.e., that the award lacks finality and definiteness. It is true that an award must be final as to the matters submitted so that the rights and obligations of the parties may be definitely fixed. *Carter* v. *Ross,* 2 Root 507, 508;

*Parkhurst* v. *Powers,* 2 Root 531; *Mercury Oil Refining Co.* v. *Oil Workers International Union,* 187 F.2d 980, 982; *McInnish* v. *Lanier,* 215 Ala. 87, 109 So. 377; *LeBlanc* v. *Beard Paper Co.,* 320 Mich. 632, 641, 32 N.W.2d 73; *Park Construction Co.* v. *Independent School District,* 216 Minn. 27, 33, 11 N.W.2d 649; *Matter of Pfeiffer, Inc.,* 222 App. Div. 62, 63, 225 N.Y.S. 294, aff'd, 251 N.Y. 508, 168 N.E. 407; *Maw* v. *Kitzman,* 55 N.D. 463, 467, 214 N.W. 273; 6 Williston, Contracts (Rev. Ed.) p. 5397; 3 Am. Jur. 947, § 125. As has been pointed out, however, the award in the present case is definitive. It does not in detail fix the pay of employees individually. It does, nevertheless, as we have interpreted it, establish the method by which each individual's pay may be fixed. It determines the principle by which the pay of each of the four classes of employees is to be computed. That is, it decides that all employees shall take a reduction of pay which is the equivalent of a reduction of 9.75 cents per hour to hourly employees. When read in connection with the submission, it means nothing more nor less than that the pay of each class shall be reduced to what it was before March 26, 1951. Under the circumstances, an award could hardly be more definitive and enforceable than that. When confirmed, it will have an effect closely akin to that of a declaratory judgment.

There remains for consideration the award embraced in paragraph 2, namely, the change in the cost-of-living formula. In its complaint, the union alleged that this part of the award should be nullified not only because it went beyond the submission but also because the escalator clause was not subject to arbitration unless the parties expressly so agreed. The court refused to pass upon the latter claim but

vacated the award on the ground of the former.

That the arbitrator went beyond the submission is clear. Instead of limiting himself to deciding whether the cost-of-living formula should provide for adjustment upon a change of 1.32 points in the index rather than 1.153 points, he undertook, after answering that question affirmatively, to apply the formula to the wage scale. This part of the award presented the ground upon which the court acted. As has been pointed out, when an arbitrator exceeds his authority, the award is void only to the extent that he does so, if the part which is void can be separated from the rest without injustice and without affecting the merits of the part of the award which is within the submission. The award set forth in paragraph 2 is one in which the good can readily be separated from the bad with justice to both parties. The valid part of the award is that which raises the required change in index points to 1.32 beginning with the first pay-roll period which commences after December 31, 1952. The arbitrator's notion of how the new formula should apply can readily be nullified without injustice to anyone. For this reason, the court was in error in vacating the entire award in paragraph 2. The award should have been corrected by striking therefrom all of the language except the following: "Beginning with the first payroll period which commences after December 31, 1952, Section 9 of the collective bargaining agreement between the parties dated August 1, 1952 shall be modified so as to provide for a 1 cent cost-of-living adjustment for every 1.32 index points' change in the U. S. Bureau of Labor Statistics Consumers' Price Index for Moderate Income Families in Large Cities, Old Series." Judgment should enter confirming the award as thus corrected.

There is no merit to the union's claim, alleged in its complaint, that the question of a modification of the escalator clause was not arbitrable. Section 12(B) of the bargaining agreement provides that differences arising between the company and the union as to the meaning and application of the provisions of their agreement, or "in regard to any other matters," shall be settled by a procedure which leads, when necessary, to arbitration; and § 15 of the agreement expressly provides that either party may seek a modification of any provision at any time.

There is error, the judgment is set aside and the case is remanded with direction to render judgment modifying and correcting the award as indicated in this opinion and confirming the award as so modified.

In this opinion WYNNE, DALY and MOLLOY, Js., concurred.

O'SULLIVAN, J. (dissenting). The modern judicial attitude toward arbitration is that its use should be encouraged. *International Brotherhood of Teamsters* v. *Shapiro,* 138 Conn. 57, 68, 82 A.2d 345. But however sympathetic the law may be toward this method of terminating controversies, arbitration must be carried out, not in some haphazard fashion suiting the fancy of the parties or the arbitrators, but pursuant to recognized rules of long standing. The need for adherence to legal principles is particularly apparent in those cases where, as here, one of the parties is seeking to convert an award into a judgment.

My disagreement with the majority is limited to the phase of the award, covered by paragraph 1, which deals with a proposed reduction in pay. My dissent is based on three grounds.

First, the award was void since it went beyond the terms of the submission. *Chase Brass & Copper Co.* v. *Chase Brass & Copper Workers Union,* 139 Conn. 591, 594, 96 A.2d 209. It is, of course, true that when an arbitrator acts partly within and partly beyond the authority derived from the submission, only so much of the award is void as lacks authority to support it, provided the part which is void can be separated from the rest without injustice. 6 Williston, Contracts (Rev. Ed.) p. 5395; Sturges, Commercial Arbitrations & Awards, § 226; 3 Am. Jur. 957; 6 C.J.S. 234; see *Dutton* v. *Gillet,* 5 Conn. 172, 175 n. The award in the case at bar is so worded that it is legally impossible to separate the valid from the void. Thus, if so much of it is upheld as reduces the hourly rates by 9.75 cents, one is confronted by the fact that there is nothing in the award, as I shall later point out, which warrants the reduction in piece rates. The injustice, then, is that one half of the employees are reduced in pay by almost 10 cents an hour while the pay of the other half remains unaffected. Like the Gordian knot, the award is incapable of being untied so that the good may be isolated from the bad. Both are inextricably bound together, and they cannot be separated by the use of a legal meat ax.

Second, the award cannot be corrected, since the merits of the controversy would be affected. *Pratt, Read & Co.* v. *United Furniture Workers,* 136 Conn. 205, 208, 70 A.2d 120; General Statutes § 8162.

Third, the award, whether viewed in its original or in its corrected form, lacks finality and definitude. Certainty is an indispensable requirement of a legal award. If it is deficient in this respect, it cannot be upheld. It must leave no loophole for future dispute on the matter submitted. See 3 Am. Jur.

947, § 125. "It is essential to the validity of an award that it be final, that is, a termination of the question under arbitration, . . . and be capable of being made the subject of a judgment or decree. Further, the award must be certain in the sense that no reasonable question can be made as to its meaning." 6 Williston, op. cit., p. 5397.

The majority have ordered the court to render a judgment incorporating the following corrected paragraph of the award:

"1. Beginning with the first payroll period which commences after December 31, 1952, all hourly rates shall be reduced by 9.75 cents. *Piece rates and plant hiring minimum rates shall be adjusted accordingly.*"

The majority do not direct the court to state in the judgment how the second sentence, which I have italicized for emphasis, is to be carried out, since there is nothing in the award to inform the reader what method the arbitrator had in mind. Indeed, the second sentence provides one of the unsolved mysteries of the case. Undoubtedly the arbitrator knew what he meant by the language he used but it is conceded that nobody else did.

For example, after receiving the award, the defendant, apparently not comprehending what the arbitrator had decided, conferred with the plaintiff and proposed that the award be determined to mean the following: "1. The hiring rate would be reduced from $1.00 per hour to $.94 per hour, the rate in effect prior to the March 26, 1951 increase. 2. The minimum rate would be reduced from $1.15 per hour to $1.10 per hour, the rate in effect prior to the March 26, 1951 increase. 3. Employees who are on minimum rate jobs, that is, who are receiving $1.15 per hour will be reduced 5¢ per hour. 4. Employees who were receiving the plant minimum of $1.10 prior to

March 26, 1951 were increased $0.0975 as of that date, therefore, they will be reduced by the same amount. 5. Hourly rate workers other than those mentioned above will be reduced by $0.0975 per hour and new hourly rates will be issued not later than January 8, 1953 for all employees on the hourly rate basis. 6. For pieceworkers, there will be $0.0975 per hour deducted from the piecework earnings of each employee until the Timestudy-Standards Division has time to issue new piece rates which, it is expected, will be completed in time to use on March 2, 1953. 7. Piecework base rates would revert to the same base rates as were in effect prior to the March 26, 1951 increase. . . ."

It further developed, as the finding shows, that when the defendant was unable to convince the plaintiff that the parties should agree to these seven propositions as determinative of what the award meant, the defendant suggested that the plaintiff go to the arbitrator to obtain his interpretation of the award. Needless to say, the suggestion was ignored.

The majority now direct the court to ripen this meaningless award into a judgment, without giving any clue as to how the piece rates and plant hiring minimum rates can be determined. It seems to me that in the light of the foregoing discussion the award, now to be altered into a judgment, cannot be characterized either as final, complete or definitive.

For the foregoing reasons, I cannot agree with the majority.

### MEMORANDUM ON REARGUMENT

INGLIS, C. J. Reargument in this case was granted but was limited to the first ground stated in the mo-

tion. That ground reads: "The court in construing the submission did not take into consideration the fact that employees receiving the plant 'minimum rate' were paid on a flat hourly basis and received an increase in March, 1951 of only five cents per hour; that those employees receiving the 'hiring rate' were paid on a flat hourly basis and received an increase in March, 1951 of only six cents per hour and that, therefore, a reduction of 9.75 cents an hour in the hourly rates paid, which include those receiving the plant minimum rate and the hiring rate would not come to the same as a reversion to the wage structure as it was prior to March 26, 1951. Thus the basic premise on which the court's decision rests is erroneous."

In the original opinion, we pointed out that the nub of the question submitted to the arbitrator was whether there should be a reduction of wages in the defendant's plant which would offset the increase which had become effective on March 26, 1951. We concluded that the effect of the award as properly interpreted was to direct a reversion of the wage structure, as it affected all employees except engravers, to what it was prior to March 26, 1951. The award, as corrected, accomplished this by directing that all hourly rates be reduced by 9.75 cents and that piece rates and plant hiring minimum rates be "adjusted accordingly."

The basic contention of the plaintiff in its motion to reargue is that, as interpreted by us, the award would result in a reduction of 9.75 cents an hour in the wages of the employees of the defendant who receive wages at the "plant minimum rate" or at the "hiring rate." That is not the interpretation we gave to the award.

It is obvious that the arbitrator did not consider

that the plant minimum rates or the hiring rates were "hourly rates" as he used that term in ordering a 9.75 cent reduction in them. Had he considered that plant minimum rates or hiring rates were "hourly rates," it would not have been necessary or meaningful for him to have added to his order that hourly rates be reduced by 9.75 cents the direction that "plant hiring minimum rates" should be "adjusted accordingly." If he had intended that plant minimum rates or hiring rates should be treated as hourly rates and therefore be reduced by the full 9.75 cents per hour, his added direction that plant hiring minimum rates should be "adjusted accordingly" would have been superfluous. As was stated in the opinion, the only reasonable interpretation of the award in so far as it pertains to plant minimum rates and hiring rates is that they be reduced proportionately to the ordered reduction in hourly rates. That is, that plant minimum rates and hiring rates should be reduced by the same proportion of 9.75 cents per hour as the increase of them in 1951 was of the then increase of 9.75 cents in the hourly rates. In other words, the award was that, to determine the amount of reduction to be made in plant minimum rates and hiring rates, the parties should apply to them in reverse the same formula whereby the parties had determined in 1951 that an increase of 9.75 cents in the hourly rates called for an increase of 5 and 6 cents per hour in the plant minimum and hiring rates respectively. It follows that the award of the arbitrator meant no more nor less than that the plant minimum wage rate was to be reduced by 5 cents per hour and the hiring rate by 6 cents per hour. The motion to reargue, therefore, is based on an erroneous conception of the interpretation given to the award in the original opinion of the court.

In oral argument, counsel for the plaintiff contended that the award is impossible of application to any reduction in the rates for piecework. Although this contention is outside of the grounds set up in the motion to reargue, we have given it careful consideration. In this matter also, as was stated in the original opinion, the award is to be interpreted as directing the parties to arrive at the reduction to be made in piece rates by using in reverse the formula used to determine in 1951 the increase in those rates which would be proportionate to an increase of 9.75 cents in the hourly rates. It is true that the exact method whereby piece rates are determined does not appear in the record. It is apparent, however, that one consideration which is a factor in that determination is the amount the average pieceworker ought to be able to earn per hour. It does appear in the record that, when the wages of the hourly workers were increased by 9.75 cents per hour in 1951, in order to reach an approximate uniformity with that increase for the pieceworkers their base rates were increased in a manner designed to produce an average increase of 8.1 cents an hour. If, in so far as the hourly wages which could be made by pieceworkers was a factor in establishing piece rates, an increase of 8.1 cents an hour was determined as being the equivalent of an increase of 9.75 cents per hour for the hourly workers, a reduction of 8.1 cents per hour in that factor will be the equivalent of a reduction of 9.75 cents per hour for hourly workers. It is an adjustment such as this that is directed in the award, which orders that piece rates be "adjusted accordingly." It is, of course, true, as was further argued, that changes in the company's products and in the productivity of the workers which have come about

since 1951 will make the fixing of piece rates in accordance with the award complicated and difficult. However, the same complications and difficulties would have been met if there had been no general increase in wages in 1951. By ordering that piece rates shall be "adjusted accordingly," i.e., proportionately to the reduction in the hourly rate, the award, in the nature of a declaratory judgment, establishes the principle that piece rates shall now be established by reverting to what they were before March 26, 1951, and, starting at that point, be refigured on the basis of time studies just as they would have been during the period since 1951 if there had been no general increase of wages throughout the plant in that year.

We see no occasion to make any change either in the opinion or in the rescript.

In this opinion WYNNE and MOLLOY, Js., concurred; O'SULLIVAN and DALY, Js., dissented (DALY, J., having heard the reargument, now desires to be recorded as dissenting from the original opinion and joining in the dissenting opinion).